LASSER, P.J.T.C.
This action was initially instituted by Morris Township to contest an agreement between Morristown and taxpayer pursuant to the Urban Renewal Act of 1961 {N.J.S.A. 40:55C-77) exempting the Headquarters Plaza complex from local property tax for a period of 17 years beginning with 1988. This court previously set aside the exemption, Morris Tp. v. LF Associates, 10 N.J. Tax 240 (Tax Ct.1988). This opinion deals with the proper tax assessments for the years 1988 and 1989 on two 11-story office buildings located in the Headquarters Plaza complex on Speedwell Avenue in Morristown, known as the East and West Buildings and shown on the Morristown tax map as Block 4901, Lots 1.01 and 1.03, respectively.
For tax year 1988, the assessor had regarded the properties as exempt from taxation pursuant to an agreement between Morristown and the taxpayers dated September 29, 1987, and therefore listed the properties as exempt. The exempt list, as required by N.J.S.A. 54:4-27, included values for the properties as if they were not exempt.
For the 1989 tax year, the assessor removed the subject properties from the exempt list and placed them on the taxable list.
The valuation and discrimination issues for the years 1988 and 1989 were heard together. Although Morris Township is plaintiff in the 1988 case, it informed the court that Morris Township would not take an active part in the valuation portion of this case.
Tax year 1987 was a revaluation year. For that year, the assessments and the Tax Court judgments which were entered pursuant to a settlement by the parties are:
*90 East Building (Lot 1.01)
Assessment Tax Court Judgment
Land $ 9,075,000 $ 6,776,000
Improvement 18.513.000 18.513.000
Total $27,588,000 $25,289,000
West Building (Lot 1.03)
Assessment Tax Court Judgment
Land $ 9,075,000 $ 6,776,000
Improvement 18.513.000 18.513.000
Total $27,588,000 $25,289,000
The values on the 1988 exempt list assessments are: and the 1989
East Building (Lot 1.01)
1988 1989
Land $ 9,075,000 $ 6,776,000
Improvements 18,513,000 18,513,000
Total $27,588,000 $25,289,000
West Building (Lot 1.03)
1988 1989
Land $ 9,075,000 $ 67776;000
Improvements 18,513,000 18,513,000
Total $27,588,000 $25,289,000
The 1988 and 1989 common levels of assessment for Morris-town Town as established by the Director of the Division of Taxation pursuant to N.J.S.A. 54:l-35b are:
1988 1989
Common level ratio 115.29% 95.95%
Upper limit 132.57% 110.34%
Lower limit 97.99% 81.56%
The East and West Office Buildings are high-rise, steel-frame, reinforced-concrete-panel and glass office buildings, *91 each containing 181,500 square feet of gross rentable area. The buildings were completed in 1982. Each building has 11 floors with 15,236 square feet on a floor[1] (a total of 167,596 square feet), a lobby, a penthouse and building service areas (a total of 13,904 square feet). Four automatic, cable-type elevators serve all floors. The buildings are fully sprinklered.
The subject buildings are two of three office towers constructed within air rights above part of a platform that forms the roof of a 3,000-car parking garage.[2] A hotel and health club, not in issue here, were also constructed above the garage. The subject buildings consist of floors 2-12 and are above a shopping mall which was constructed on top of the garage. The lobby and building service areas are located on the same level as the shopping mall. The lobby and building service areas (floor 1), as well as the shopping mall, are not the subject of this action but are the subject of separate assessments.[3]
*92 I.

East Office Building.

A.

Taxpayer’s Appraisal Expert.

Taxpayer’s appraisal expert valued the East Building using only the income approach. The sales comparison approach was not used because of a stated lack of recent sales of comparable properties. The cost approach also was not used, although the expert indicated that this approach, “if properly structured,” would approximate the value derived by the income approach.
The East Office Building is leased to a single tenant, AT&T Resource Management Corporation (AT&T), for a five-year term commencing March 1, 1988 at $1,805,925 a year. This lease for 181,500 square feet of rentable area is at a net rental of $9.95 a square foot. A separate parking agreement, with First Roc, provides for 726 parking spaces in the garage at $35/car/month for the initial year, with 3% annual increases thereafter. This expert testified that the standard parking rental rate is $50/car/month, and that the total annual parking concession based on the $15 differential is $130,680. Following is a summary of this expert’s income approach valuation:
1988 Valuation.
Actual annual net contract rent @ $9.95/sq. ft.
Less: vacancy allowance @ 2% 36,118
Estimated annual effective net income $ 1,769,807
Estimated annual expenses.
Barking expense $130,680
Lease commissions (1) 119,744
Management, legal, auditing (2) 53,094
Exterior & structural repairs (3) 54,450
Reserve for replacements (4) 36,300
Total - 394,268
Estimated annual net income attributable to property before capitalization $ 1,375,539
*93 Capitalization Rate.
Mortgage - 75% X .1091 = .0818
Equity - 25% X .0800 = .0200
Weighted capitalization rate .1018
$1,375,539 capitalized @ .1018 $ 13,512,200
NOTES:
(1) Lease commissions—$119,744—Amortization of actual lease commissions of $598,721 over the five-year lease term ($598,721/5 years).
(2) Management, legal, auditing—$53,094—Stabilized @ 3% of estimated annual effective net income ($1,769,807 X 3%).
(3) Exterior & structural repairs—$54,450—Stabilized @ $.30 a sq. ft. of building area (181,500 sq. ft. X $.30)
(4) Reserve for replacements—$36,300—Stabilized @ $.20 a sq. ft. of building area (181,500 sq. ft. x $.20)
This expert stated that, of the $13,512,200 total property value, he allocated $6,776,000 (the 1989 land assessment) to land (air rights) and the balance of $6,736,200 to improvements. This expert concluded that the property had the same value as of October 1, 1987 and October 1, 1988.
B.

Taxing District’s Appraisal Expert.

This expert used all three approaches to value the East Building. For the cost approach, three land sales were considered, and the Marshall Valuation Service, a nationally-known building cost manual published by the Marshall and Swift Publication Company, was used to value the improvements. The purchase prices of the land sales were converted to square-foot-of-building figures using the amount of permitted improve *94 ment area, and adjustéd for conditions of sale, date of sale, location and physical character of the property. The improvements rate, taken from the Marshall Valuation Service, for a good, class A building was adjusted for multi-story, sprinkler, multipliers (local, current and perimeter), indirect costs, entrepreneurial profit and time. A summary of this expert’s cost approach analysis follows:
Land.
Sale 1 Sale 2 Sale 3
Sale price $2,350,000 $33,000,000 $10,100,000
Unit value $34.56/ sq.ft.bldg. $30.34/ sq.ft.bldg. $28.83/ sq.ft.bldg.
Adj. unit $35.14/ $30.34/ $33.15/
value sq.ft.bldg. sq.ft.bldg. sq.ft.bldg.
Land value conclusion 181,500 sq.ft. X $30/sq.ft. = $5,445,000
Improvements.
10/1/87 10/1/88
Base cost $ 93.06/sq.ft.
Multi-story adjustment 4.19
Sprinkler adjustment 1.25
Adjusted base cost $ 98.50/sq.ft.
Adjusted for multipliers
Local cost (1.27) 125.10
Current cost (1.04) 130.10
Perimeter (.926) 120.47
Indirect costs not covered by Marshall X 1.05
$126.50/sq.ft.
Entrepreneurial profit X 1.10
$139.14 $139.14
Time adjustment X .9151 X .9819
(rounded) $127.00/sq.ft. $137.00/sq.ft.
Building value $23,219,664 $25,047,984
Depreciation @ 5% - 1,160,982 @ 7% - 1,753,359
Net value $22,058,682 $23,294,625
*95 Summary.
10/1/87 10/1/88
Land value $ 5,445,000 $ 5,445,000
Improvements value 22,058,682 23,294,625
Total value (rounded) $ 27,500,000 $28,740,000
This expert’s sales comparison approach considered three sales, summarized as follows:
Sale Sq. Ft. Price/
Location No. Sale Price Date Bldg.Size Sq.Ft.Bldg.
Parsippany 1 $114,250,000 1/87 528,315 $216.25
Parsippany 2 12,000,000 1/87 72,217 166.17
Morristown 3 15,750,000 8/88 82,561 190.77
After adjustments for date of sale, location and physical condition, taxing district’s expert selected a figure of $155 a square foot for the subject property. Using 181,500 square feet of building, the resulting value as of October 1,1987 by the sales comparison approach is $28,130,000 (rounded). This expert determined the sales comparison approach value as of October 1, 1988 to be the same as that for October 1, 1987.
This expert’s income approach varied from taxpayer’s expert’s in the treatment of the lease rental. Taxing district’s expert concluded that the lease between LF Associates and AT&T for the East Building “is not reflective of current economic rent as of the dates of the appraisal.” This expert used instead the rental information from the West Building and other office buildings in the area. His lease information is summarized here.
*96 Date Signed Landlord Tenant Term (Yrs.) Unit Area Rent (Sq.Ft.) ($/S.F.) Net Rent [4] ($/S.F.)
3/88 Third Roc AT&T 5 66,000 19.75 13.77
3/88 Bristol Myers 5 2,890 25.00 18.12
12/88 Paine Webber 10 13,610 29.98 16.40
2/88 Secret Service 10 16,500 27.38 21.24
9/81 Riker, Danzig 12 44,658 16.25 12.60
12/85 10 4,842 18.00 14.35
9/87 7 33,000 22.50 16.18
4/88 MorstwnOffCtr Giblin 5 6,598 22.63 15.04
6/87 Mut.Omaha 3 2,350 24.50 16.91
3/87 ADT 15 135,012 22.03 21.90
10/88 Mack * AT&T 9% 475,100 14.86 (1) 14.86
2/89 AT&T m 387,000 12.51 “ (2) 12.51
12/87 Blckberry * 195 Brdwy 5 148,920 14.75 14.75
9/87 Shav Assoc.** AT&T 5 46,986 22.00 14.27
(1) First five years only; then $16.48/sq.ft.
(2) First five years only; then $14.63/sq.ft.
From the foregoing, this expert concluded that the net market rental for the subject property is $15 a square foot. The value for October 1, 1987 and October 1, 1988 by the income approach was determined as follows:
181,500 sq. ft. X $15/sq. ft. $ 2,722,500
Less: vacancy and credit loss @ 5% - 136,125
Effective net rent $ 2,586,375
Less expenses (structural repairs, reserves and mise.—total of 5%)
- 129,319
$ 2,457,056
Capitalized @ 9% Income approach value
$27,300,000 (rounded)
Summarv.
10/1/87 10/1/88
Cost approach value $27,500,000 $28,740,000
Sales comparison approach value $28,130,000 $28,130,000
Income approach value $27,300,000 $27,300,000
This expert concluded that the value of the East Building as of October 1, 1987 was $27,300,000 and that the value as of October 1, 1988 was the same.
*97 II.

West Office Building.

A.

Taxpayer’s Appraisal Expert.

As with the East Building, this expert relied only on the income approach to value the West Building. A lease between AT&T and Third Roc for floors two through five, the terms of which are $19.75 a square foot gross for five years commencing March 1, 1988, was considered by this expert as indicative of the gross economic unit rental for the entire 181,500 square feet of building.
This expert calculated the net income to be $1,584,527 and the property value to be $13,371,500. A summary of the calculations follows.
1988 Valuation.
Estimated annual gross economic income potential.
181,500 sq. ft. @ $19.75/sq. ft. $ 3,584,625
Less: vacancy allowance @ 11%[5] — 394,309
Estimated effective annual gross income $ 3,190,316
Estimated annual expenses.
Operating expenses $435,600
Exterior & structural repairs 54,450
Reserve for replacements 36,300
Tenant electric 299,475
Management, legal & auditing (3%) 95,709
Lease commissions 248,655
Parking expense and expense for tenant’s allowance and free rent 435,600
Total - 1,605,789
Estimated annual net income attributable to property before capital requirements and real estate taxes $ 1,584,527
*98 Capitalization Rate.
Mortgage capital — 75% X .1091 = .0818
Equity capital — 25% X .0800 = .0200
Weighted capitalization rate .1018
Plus: Effective real estate taxes .0167
Total .1185
$1,584,527 capitalized @ .1185 $13,371,500
This expert stated that, of the $13,371,500 total property value, he allocated $6,776,000 (the 1989 land assessment) to land (air rights) and the $6,595,500 balance to improvements. This expert concluded that the property value was the same as of October 1, 1987 and October 1, 1988.
B.

Taxing District’s Appraisal Expert.

This expert used all three approaches to value the West Building. In his cost approach, this expert used the same land sales and Marshall Valuation Service base cost and adjustment factors as for the East Building, except the time and depreciation adjustments, to arrive at the same property values as found for the East Building, $27,500,000 as of October 1, 1987 and $28,740,000 as of October 1, 1988.
In his sales comparison approach, this expert used the same property sales and adjustments for the market, location and building physical condition as for the East Building to arrive at the same property value as found for the East Building, $28,-130,000 as of October 1, 1987 and October 1, 1988.
*99 In his income approach, this expert used the actual West Building leases, a vacancy and credit loss allowance of 5%, an expense allowance of 5% and a capitalization rate of 9%, all of which were also used to derive the value of the East Building by the income approach, to arrive at the same value as the East Building, $27,300,000, as of October 1, 1987 and October 1, 1988.
A summary of this expert’s opinions of value for the West Building by the three approaches follows.
10/1/87 10/1/88
Cost approach value $27,500,000 $28,740,000
Sales comparison approach value $28,130,000 $28,130,000
Income approach value $27,300,000 $27,300,000
Value determination $27,300,000 $27,300,000
III.
The Headquarters Plaza complex is different from other Morris County office buildings in that it consists of a large concentration of office space in a limited area in a central business district on air rights and without free parking. In addition to the subject East and West Buildings, there is a third 12-story building in the complex with 500,000 square feet of space.
Physically, the East and West Buildings are almost identical. They must be valued at their highest and best use. Highest and best use has been defined as “the reasonably probable and legal use of ... an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 269.
Further, in valuing these income-producing buildings, the income approach must be given the most weight. The sales comparison approach is less reliable due to the location of the *100 subject buildings in the central business district and the use of air rights instead of land upon which to construct the buildings. Since these are in-city buildings constructed on air rights, they differ from the many campus-style office buildings in the surrounding Morris County area. The major differences are the subject’s lack of ease of access and the absence of a picturesque setting with ample free parking. On the other hand, shopping, dining and other services are readily at hand in Morristown. The differences make it difficult to estimate the market or economic rent of the subject buildings by comparing rents of campus-style office buildings.[6] However, there is ample evidence of current market rents within the subject buildings. I will, therefore, estimate the economic rental value from the actual rents. See Parkview Village Asso. v. Bor. of Collingswood, 62 N.J. 21, 297 A.2d 842 (1972).
These rents, as testified to by taxpayer’s appraisal expert, yield for the East Building a net income to the owner before vacancy allowance of $7.78 a square foot from the single tenant AT&T occupancy. This expert testified that the multitenanted West Building produces a net income to the owner before vacancy allowance of $10.88 a square foot. It is apparent that the multi-tenanted West Building produces a higher net income. Each tenant leases at least a full floor, and there is no evidence that there are any physical differences between the two buildings even though the West Building is multi-tenanted. I will, therefore, use the rentals in the West Building to determine the economic rental value of each of the buildings to achieve the uniformity of assessment required by the New Jersey Constitution.
The East Building is leased in its entirety to AT&T. This building had been leased to 195 Broadway Corp. (an AT&T affiliate) for a five-year term from January 1, 1983 to Decem *101 ber 31, 1987 at $12.25 a square foot net. The lease contained an option to renew for five years if exercised by August 1, 1986. The option was not exercised, but the tenant continued on a month-to-month basis until March 1, 1988, when a new lease was entered into with AT&T for five years ending February 28, 1993 at $1,805,925 ($9.95 a square foot net before deduction of certain landlord expenses). A separate parking agreement allowed the tenant 726 parking spaces at $35 a month per car for the first year, with 3% yearly increases in cost thereafter.
The West Building had also been leased in its entirety to 195 Broadway Corp. for the five-year period November 15, 1982 to November 30, 1987, and three floors were leased back simultaneously and leased by the landlord to Riker, Danzig & Scherer beginning April 1, 1983, for 12 years at $16.25 a square foot gross. The 195 Broadway Corp. lease contained an option to renew for an additional five years if exercised by August 1, 1982. This option to renew was not exercised, but the tenant continued as a month-to-month tenant in 132,000 square feet from December 1,1987 to March 1,1988, when a new lease was entered into with AT&T for 66,000 square feet at $19.75 a square foot gross. In the summer of 1987 it appeared to the owners that most floors of the North, East and West Office Buildings would be vacant. By December 5, 1988, the West Building was fully leased. A lease summary follows:
Tenant Lease Floor Term Sq.Ft. Rent/ Area Sq.Ft. Net rental as adjusted by Txpyr. Tax.Dist.
AT&T 2-5 3/1/88-2/28/93 66,000 $19.75 $10.00 $13.77
Paine Webber Part 6 3/1/89-5/1/99 13,610 $22.50 $ 8.84 $16.40
Paine Webber Bal. of 6 4/1/90-5/1/99 2,890 $23.50 $10.09 - -
Secret Service 7 6/1/88-5/31/98 16,500 $27.375 $14.60 $21.24
*102 Tenant Lease Floor Term Sq.Ft. Rent/ Area Sq.Ft. Net rental as adjusted by Txpyr. Tax.Dist.
Riker, Danzig & Scherer 8 2/28/88-3/31/95 16.500 $22.50 $12.96 $16.18
Riker, Danzig & Scherer 9 1/1/88-3/31/95 16.500 $22.50 $11.15 $16.18
Riker, Danzig & Scherer 10, 11 4/1/83- & 12 3/31/95 49.500 $16.25 $11.18 $12.60
181,500
I begin with the actual gross rentals paid by the West Building tenants but adjust the 1983 Riker rent to $19.75 a square foot (the square-foot rent negotiated in 1988 with AT&T for larger space) as follows:
AT&T 66,000 sq. ft. @$19.75 $1,303,500
Paine Webber 16,500 sq. ft. @$22.50 371,250[7]
Secret Service 16,500 sq. ft. @$27.38 451,700
Riker, Danzig 49,500 sq. ft. @$19.75 977,625 •
Riker, Danzig 16,500 sq. ft. @$22.50 371,250
Riker, Danzig 16,500 sq. ft. @$22.50 371,250
$3,846,575
I find that the appropriate vacancy rate is 5%. Although higher vacancy rates existed in other areas of Morris County, this in-city location is in a different market. Both buildings are fully rented, the West Building having been fully rented less than one year after AT&T vacated 115,500 square feet in March *103 1988. Further, I deduct as an expense the free-rent portion of the leases rather than include free rent in the vacancy and rent loss allowance.
I find that the expenses to be deducted are:
Operating expense $402,105
Exterior and structural repairs 54,450
Reserve for replacements 36,300
Tenant electric 294,525
Management, legal & auditing @ 3% 109,627
Lease commissions @ 5% 192,329
Parking expense 225,000
Tenant allowances 149,608
Free rent 45,869
The repairs and reserve for replacements figures, and the management, legal and auditing percentage are the figures or percentage used by taxpayer’s expert. I find that a brokerage commission of 5% of gross rents is liberal when dealing with large rentals which are not completely net. There is no adequate explanation for payment of higher brokerage commissions. A breakdown of the other expense items is:
Operating Tenant Parking Tenant Free Expense Electric Expense Allowances * Rent
AT&T $158,400 $ 108,900 $158,400 $ - $ -
Paine Webber $ 51,150 $ 24,750 $ 36,000 $ 96,313 ** $ 7,162
Secret Service $ 52,635 $ 33,000 $ 9,600 $ 53,295 $ -
Riker (10-12) $ 64,350 $ 61,875 { $ $ -
Riker (9) {$ 75,570 $ 66,000 {$ 21,000 $ - {$38,707
Riker (8) { { $ - {
Totals $402,105 $ 294,525 $225,000 $149,608 $45,869
A summary of my calculation of the value of the subject by the income approach is:
*104 Gross income $ 3,846,575
Vacancy & rent loss @5% — 192,329
Effective gross income $3,654,246
Expenses:
Operating expenses 402,105
Exterior & structural 54,450
Reserve for replacements 36,300
Tenant electric 294,525
Management, legal & audit @ 3% 109,627
tease commissions @ 5% of gross 192,329
Parking expense 225,000
Tenant’s allowances 149,608
Free rent 45,869
Total expenses 1,509,813
Net income $ 2,144,433
Capitalized at .1067 [8] $20,097,778
$20,097,800/rounded
I find this value to be applicable to both the East and the West Buildings for 1988 and 1989. The allocation of this value between land and improvements in this case is arbitrary because there is no land, only air rights. . Since this allocation between air rights and improvements is, at best, arbitrary, I will allocate a nominal value to “land,” as follows:
Land $ 1,000
Improvements 20,096,800
Total $20,097,800
The common level ratio for 1988 is 115.29%, and therefore the proper assessment is 100% of value, or $20,097,800.
The common level ratio for 1989 is 95.95%. Since the 1989 assessment exceeds 100% of value, the assessment must be reduced to the 95.95% common level, or $19,283,800 (rounded).
The Clerk of the Tax Court is directed to enter a judgment reducing the assessments to:
*105 1988 1989
East Building East Building (Lot 1.01)
Land $ 1,000 $ 1,000
Improvements 20,096,800 19,282,800
Total $20,097,800 $19,283,800
West Building West Building (Lot 1.03)
Land $ 1,000 $ 1,000
Improvements 20,096,800 19,282,800
Total $20,097,800 $19,283,800

Leases are based on an area of 16,500 square feet a floor, which includes a share of the lobby, penthouse and building service areas.

The land over which the subject buildings are constructed is owned by the Town of Morristown and leased to Speedwell Development Corporation (SDC), a non-profit urban renewal corporation. SDC constructed the parking garage and sublet the garage (lower area) to First Roc-Jersey Associates. The Town of Morristown leased the air space above the roof of the garage (upper area) to Second Roc-Jersey, permitting Second Roc-Jersey to construct office and retail space and a hotel. LF Associates is a successor in interest to Second Roc-Jersey Associates for the East Office Building portion of the upper area occupancy, and Third Roc-Jersey Associates is a successor to Second RocJersey Associates for the West Office Building.
The parking garage is exempt from local property taxation pursuant to an agreement between SDC and the Town of Morristown, in accordance with the provisions of the Urban Renewal Nonprofit Corporation Law of 1965. N.J.S.A. 40:550-77 et seq., as amended. The 9.33 acres of land underlying the project are separately assessed to SDC at $4,140,000. The air space above the roof of the garage constitutes the “land” portion of the assessment here in issue.

There is no testimony in this case regarding those assessments or their effect on the subject assessments.

 Morris Township

 Parsippany

 After adjustment by taxing district’s expert for landlord's expense obligation, for general operating cost, electricity and real estate taxes, and contracted-for rent concessions.

 Taxpayer’s expert’s appraisal report, exchanged prior to trial and introduced in evidence, used 8% vacancy. During the trial, this figure was changed to 11%, which changed this expert’s opinion of value from $14,251,800 to $13,371,500 for 1988 and 1989.

Taxing district’s sales comparison approach relied on sales of campus-style office buildings with substantially more land than the air rights "footprint" of the subject.

A former occupant, Bristol Myers, was paying $25 a square foot for a small portion of this space under a lease dated February 1988. I have used only the initial annual rental paid by Paine Webber, although the lease rental increases each year from $22.50 to $37.50 by the tenth year, and have balanced this by not deducting the cost of money on landlord allowances and free rent. Further, deducting the cost of the use of money may well be double counting because the capitalization rate also provides a return on landlord’s capital outlay.

 I find the $15 tenant allowance to Riker, Danzig to be customary and appropriate and have used this figure in my calculations. No evidence of residual value of tenant improvements to the landlord was introduced.

 Includes lease takeover and cost to move prior tenant.

The capitalization rate is made up of a risk and return rate of 9% and the tax rate for 1988, which is also the effective tax rate for 1989, of $1.67.