KUSKIN, J.T.C.
Plaintiff appealed the 1994 and 1995 local property tax assessments on the Pine Plaza Shopping Center, Hanover Township, designated on the Township Tax Map as Block 4001, Lot 12. For each of the years under appeal, the assessment on the property was a total of $6,170,600, allocated $1,586,700 to land and $4,583,-900 to improvements. For tax year 1994 the applicable ratio under N.J.S.A. 54:l-35a (the Chapter 123 Ratio) was 51.47%. For tax year 1995, the Chapter 123 Ratio was 53.99%.
The property is a strip shopping center located on the eastbound lanes of Route 10, a major four-lane divided highway. The center contains 110,848 square feet of first floor rentable space. The parties have stipulated that such space is divided as follows: supermarket — 39,700 square feet; large store — 10,523 square feet; small stores — 60,625 square feet. In addition, there is a basement area containing 4,000 square feet located below the supermarket and, as of the valuation dates of October 1, 1993 and October 1, 1994, used exclusively by the supermarket operator for office space.
The shopping center, as originally constructed in or about 1965, contained approximately 30,000 square feet of first floor rentable space, with approximately 6,400 square feet of basement area. The initial tenants were a Foodtown Supermarket and a few satellites. On December 26, 1989, the Hanover Township Planning Board granted site plan approval for a major expansion of the center to its current size. The expansion, which included a renovation and enlargement of the Foodtown premises, was completed in 1991.
Efforts to obtain new tenants commenced during construction of the expansion and continued thereafter. These efforts resulted in two new leases in 1990 (including a lease for 10,523 square feet to Hook-Superx), twelve new leases in 1991, two new leases in 1992, one new lease in 1993 and no new leases in 1994. During 1994, however, there was an expansion of one store in the shopping center, and the lease with the Foodtown Supermarket was modified and revised.
*199 The expansion of the center was financed by a $17,117,574 mortgage loan from Fleet Bank, plus a $4,000,000 second mortgage loan used for the renovation and enlargement of the supermarket (of which $600,000 was used to purchase tenant fixtures). Because of the debt load imposed by this mortgage financing and the low level of leasing activity, the center quickly encountered financial difficulties. By late 1992, Fleet Bank became involved in the management of the center and in leasing activities. On May 11,1994, a subsidiary of the Bank acquired title to the premises by deed in lieu of foreclosure. On January 27, 1995, the plaintiff purchased the shopping center for $7,500,000. Neither appraiser relied upon the sale to plaintiff as a reliable indicator of value because the sale was of a “leased fee” with the price materially influenced by the approximately 30% vacancy at the shopping center.
Since the completion of the expansion in 1991, the shopping center has suffered from a persistent vacancy rate in excess of 25%. The appraiser for the municipality testified that this vacancy resulted from a lack of competent aggressive management and cited, in support of his opinion, the decline in the number of new leases in 1992,1993 and 1994 and the involvement of the mortgagee in the management and leasing of the shopping center beginning in late 1992. The appraiser for the plaintiff testified that, notwithstanding the involvement of the mortgagee, the shopping center had competent managing agents so that the decline in leasing activity was not attributable to any lack of managerial competence or aggressiveness.
It is impossible to determine whether the fall-off in leasing activity was the result of the mortgagee’s involvement or whether the mortgagee’s involvement was the result of the fall-off in leasing activity. In general, however, I find that, as of the applicable valuation dates, the shopping center was negatively affected by the following factors:
1) The center is somewhat isolated, being located approximately two miles west of the booming retail development on Route 10 in the Township of East Hanover and approximately two miles east *200 of a major shopping center in Morris Plains. The area immediately surrounding the center consists of small retail, small office, and residential uses.
2) The shopping center buildings are approximately 500 feet from Route 10. As a result of this setback and the trees and road terrain in the immediate area of the center, the center has poor visibility. Except for an identifying pylon sign (discussed below), the center is generally not visible from Route 10 until a motor vehicle is close to the entrance.
3) The shopping center has a pylon sign near Route 10 which contains the name of the center and a clock. The sign does not, however, contain identification signs for any of the tenants, even Foodtown and Superx. The evidence did not establish whether plaintiffs predecessors-in-title made any efforts to obtain municipal approvals for the expansion or enlargement of such sign or for additional signs. Plaintiff made no such efforts for over twenty months after acquiring the center. Although local tenants have signed leases without the pylon sign identification signs they initially demanded, the unavailability of pylon signs has hampered leasing to national and regional chain stores which generally require identification signs on shopping center pylons. The shopping centers located in East Hanover provide at least some tenant identification signs on their pylon signs.
4) The construction of the expanded center contemplated store units of approximately 1,500 square feet. Such units are combinable but are not suitable for so called “big box” or “power” stores because of inadequate ceiling heights.
No one of the foregoing factors was, in itself, sufficient to place the shopping center at a significant disadvantage as compared to competitive centers located to the east on Route 10 in East-Hanover and to the west on Route 10 in Morris Plains. The combination of such factors, however, had a material negative impact on the center, its attractiveness to tenants and the rents which it could command.
*201 Both appraisers agreed that the highest and best use of the subject property was for continued use as a strip shopping center, and I accept their opinions on this issue. Both appraisers utilized an income approach to valuation. The appraiser for the municipality also used a cost approach but only as a check on his income approach and not as an independent basis for his valuation determination. I find that, for this income-producing property, the income approach is the appropriate valuation method, Appraisal Institute, The Appraisal of Real Estate 449 (11th ed. 1996), and I will determine the value of the center using only this approach. I accept the opinion of both appraisers that, in determining value, I should utilize the same rents, vacancy and collection loss allowance, and expenses for both 1994 and 1995, with only the capitalization rate changing from year-to-year.
The first step in the income approach is to determine economic rent for the rentable area at the shopping center. Both appraisers agreed, and I so find, that, for a shopping center such as the subject property, rents should be determined on a net basis with the tenants being responsible for payment of real estate taxes, insurance, and operating expenses.
As to the large store area, containing 10,523 square feet, the parties stipulated that the economic rent, as of the applicable valuation dates, was $14.50 per square foot net.
As to the supermarket, the plaintiffs appraiser determined an economic net rent of $13.50 per square foot and the defendant’s appraiser determined $13.65 per square foot. The actual rent contained in the May 15, 1994 modification and revision of the supermarket lease was $13.65 per square foot. Three of the four comparable supermarket leases used by the taxpayer’s appraiser (two of which were also used by the municipality’s appraiser) reflected, after adjustment by taxpayer’s appraiser, rent in excess of $13.65 per square foot. The fourth comparable is located in Berkeley Heights, in a different county and a significant distance from the subject property. Furthermore, the rent in such lease was established in the context of an assignment by the tenant, Grand Union, of its ground lease for a shopping center, and a *202 leaseback to Grand Union of new supermarket premises to be constructed by it at the shopping center with reimbursement by the landlord of a specified amount for construction costs. I give little weight to this comparable and to the two comparables utilized by the municipality’s expert located in Passaic and Somerset counties, respectively. I find that $18.65 per square foot, net, is the proper economic rent for the supermarket.
As noted above, the supermarket administrative offices are located in 4,000 square feet of basement space. The supermarket lease is silent as to any separate rental for this space. The taxpayer’s expert testified that such space is not independently rentable and must be used as part of the supermarket. The expert for the municipality testified that the space has outside access, is suitable for leasing independently, and warrants an economic rent of $8.50 per square foot, net. This amount is equal to one-half of the economic rent which he determined for satellite space (see discussion below). The municipality’s appraiser made no separate analysis of rental comparables for this space. He based his use of one-half of satellite space rent on his analysis of a shopping center or centers in Wayne, New Jersey.
I find that this 4,000 square feet of office space cannot be separately leased. The space has direct access to the parking lot, but the access door is more in the nature of a fire exit required for code compliance than an attractive entrance to office space. Even if I found this space could be separately leased, I could not, because of a lack of reliable evidence, find the appropriate rent to be attributed to the space. Accordingly, I find that the 4,000 square feet of office space should be deemed incorporated in the economic rent of $13.65 per square foot for the 39,700 square feet of first floor supermarket space.
The remaining, and most significant, issue as to economic rent relates to the satellite store space. The appraiser for the taxpayer determined an economic net rent of $15.50 per square foot, and the appraiser for the municipality $17 per square foot. The appraiser for the taxpayer relied upon four comparable *203 leases, only two of which are located in shopping centers similar to the subject. One such comparable reflected an unadjusted rent of $18.05 per square foot which the appraiser adjusted to $16.25 per square foot. The other reflected an unadjusted rent of $13.30 per square foot which he adjusted to $13.96 per square foot.
Taxpayer’s appraiser also relied upon the leases and rents at the subject shopping center. He noted that most of the tenants with contract rents ranging from $20 to $23 per square foot were paying only $8 to $15 per square foot. Certain of the tenants unilaterally reduced their rent payments without the consent or agreement of the landlord, while others may have obtained the landlord’s consent. Plaintiff presented no written agreements evidencing such consent except as to one store at the center for which rent was reduced to $15.05 per square foot as of October 1, 1994 in connection with expansion of the store.
Finally, taxpayer’s appraiser considered three post-assessing dates leases at the subject center, one dated May 1,1995 at $14.85 per square foot, one dated October 1, 1995 at $14.95 per square foot and one dated November 1, 1995 at $13.43 per square foot.
The municipality’s expert relied primarily on the contract rents for the subject property. He ignored the subsequent undocumented rent reductions because he did not, and could not, determine that they represented negotiated agreements between the tenants and the landlord. The expert also considered five comparable leases, all different from the comparables used by the taxpayer’s expert, and made very few adjustments. He made no adjustments to four of these leases which indicated net rents of $16, $21, $17.59 and $18.69 respectively. As to his fifth comparable, he adjusted the contract rent of $18 per square foot to $16.20 per square foot. Of these comparable leases, three are located in strip shopping centers, two of which are comparable in size to the subject property. One such comparable is located in a shopping center in Morris Plains and indicated a rent of $16 per square foot (the taxpayer’s expert utilized a comparable lease from the same shopping center with a per square foot rent of $18.05 adjusted to $16.25). The other such comparable is located in an East Hanover *204 shopping center and, after adjustments, indicated a rent of $16.20 per square foot.
The expert for the municipality also considered post-assessing dates leases at the subject property. Specifically, he noted a lease dated August 1, 1996 which, after adjustment for the tenant contribution to the cost of the tenant improvements, indicated a rent of $15.99 per square foot. The expert was aware of the post-assessing date leases considered by the taxpayer’s expert, but noted a post-assessing date lease at the shopping center dated November 1, 1995 at $18.43 per square foot and another dated February 1,1996 at $18.52 per square foot.
Year-by-year review of the leases at the center indicates that, during 1991, leases for satellite space were entered into at per square foot net rents of $10.28, $12, $12.80, $16.43, $17.10, $18, $19.14, $21.76, $22.83, $23.08, $24.73 and $25.06. In 1992 leases were entered into at per square foot net rents of $17.29 and $17.87. In 1993, there was a lease at $18 per square foot net. In 1994, the rent for one store was reduced to $15.05 per square foot net. In 1995, there were new leases at per square foot net rents of $12.81, $14.85, $14.95, $18.43 and $18.52. In 1996 there was one lease at $15.99 per square foot net. I find that the leases in 1992 at net rents above $20 per square foot are not reflective of the rental value of the satellite space in the shopping center as of the valuation dates of October 1, 1993 and October 1, 1994, nor is the 1992 lease at $10.28 per square foot. The remaining rents range from $12 to $19.14 per square foot. Based upon this range and my analysis of the comparable leases, I find that the proper economic net rent for the 60,625 square feet of satellite space at the subject shopping center is $16 per square foot.
The next step in the income analysis is the determination of a vacancy and collection loss allowance. The taxpayer’s appraiser used a 20% allowance consisting of 15% for vacancy and 5% for collection loss. The expert for the municipality used a 5% allowance including both vacancy and collection loss. Both appraisers considered the vacancy levels in other shopping centers. These shopping centers, at specific points in time, demonstrated *205 vacancy rates from 0% to approximately 7%. Such rates could easily vary from time to time. For example, one of the shopping centers considered by the taxpayer’s appraiser had vacancy rates on two different dates of 3.99% and 11.38%, respectively.
The municipality’s appraiser, in addition to considering vacancy rates at other shopping centers, also relied upon a study by Brunelli & Co., Inc. of vacancy rates on Route 10 for each of the years 1993 through 1995. These rates were 5.8% for 1993, 3.3% for 1994 and 5.4% for 1995. The expert, however, apparently did not note or give any significance to the following language from the text of the Brunelli report relating to Route 10 vacancies:
With Et. 10 having the second largest inventory of retail footage in the state’s Northern tier, the 5.4% rate is no cause for alarm. Some areas, such as East Hanover and the Ledgewood Circle, remain extremely tight. On the other hand, several long standing problem, properties will probably remain that way.
[ (Emphasis added).]
The subject property has experienced a vacancy rate in excess of 25% since the expansion of the shopping center in 1990-1991. I find that the financial difficulties of the shopping center had a negative impact on the coherence and aggressiveness of leasing efforts. The 15% vacancy allowance used by plaintiffs appraiser is not an appropriate long-term stabilized vacancy rate because it is unduly influenced by the experience of the subject property during a period of financial turmoil. Five percent is also an inappropriate stabilized vacancy rate because it totally ignores the history of the subject property and is based on vacancy rates at highly successful centers which do not suffer from the negative factors set forth above.
Considering (i) the history of the subject property, (ii) vacancy rates at other shopping centers which were considered by both appraisers, (iii) the negative factors affecting the subject property, and (iv) that “a vacancy allowance must be predicated on an estimate of the long-term quality and durability of the rental income stream,” University Plaza Realty Corp. v. City of Hackensack, 12 N.J.Tax 354, 369 (Tax 1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. denied, 134 N.J 481, 634 A.2d 527 *206 (1993) (citation omitted), I find the appropriate vacancy allowance to be 10%.
The Appraisal of Real Estate defines the vacancy and collection loss allowance as follows:
Vacancy and coUection loss is an allowance for reductions in potential income attributable to vacancies, tenant turnover, and nonpayment of rent.
Annual rent collections are typically less than annual potential gross income, so an allowance for vacancy and collection loss is usually included in the appraisal of income-producing property. The allowance is usually estimated as a percentage of potential gross income, which varies depending on the type and characteristics of the physical property, the quality of its tenants, current and projected supply and demand relationships, and general and economic conditions.
[The Appraisal of Real Estate, supra, at 489.]
The appraiser for the municipality testified that he found no market evidence to support a separate collection loss allowance in addition to a vacancy allowance, that collection loss is attributable only to vacant space and that occasional non-payment or delayed payments of rent for occupied space do not result in a net loss of rental and thus do not warrant adding a separate factor to • the vacancy percentage. I disagree and find that, for the subject shopping center, it is reasonable to include a factor for occasional non-payment of rent by tenants as well as rent interruptions resulting from the gap between the vacating of space by one tenant and the occupancy of space by a new tenant. I find such factor to be 2%. Accordingly, I find a total vacancy and collection loss allowance of 12% to be appropriate.
The next step in the income approach analysis is a determination of operating expenses to be deducted from effective gross income (gross potential income reduced by the vacancy and collection loss allowance). Because the shopping center is being valued on a net lease basis, the categories of expenses payable by the landlord are limited. Both appraisers deducted expenses for management fees, leasing commissions and reserves. The appraiser for the taxpayer also deducted an expense for common area maintenance costs not reimbursed to the landlord by reason of vacant space or tenants in financial default, and an expense for a tenant improvement allowance. The appraiser for the munici *207 pality did not deduct such expenses but did deduct a miscellaneous expense.
The taxpayer’s appraiser used a management fee of 5% of effective gross income and the municipality’s appraiser used 3% (5% less a deduction of 2% attributable to the administrative fee included in common area expense reimbursements from tenants). The municipality’s appraiser testified, based on his review of the leases at the subject shopping center, that an administrative fee of 10% to 15% of other common area maintenance costs was standard in such leases. The taxpayer did not dispute this testimony. Only two such leases were offered into evidence. In one lease, the definition of common area maintenance costs included an administrative fee of 15% of other common area costs. In the other, a post-assessing dates lease, the definition of common area maintenance costs included a management fee which “shall be 4% of the annual gross rent of the shopping center.” I conclude that there should be a deduction from the management fee for the administrative fee included in common area maintenance cost reimbursements. As discussed below, I find that $2.50 per square foot is the proper common area maintenance cost exclusive of an administrative fee. I can, therefore, determine the dollar amount of an administrative fee equal to 10% or 15% of this common area maintenance cost. The product of multiplying $2.50 per square foot by 110,848 square feet and then by 15% is $41,568. Reducing this amount by the 12% vacancy and collection loss determined above produces $36,580, or approximately 2.5% of the effective gross income determined using the economic rents and the vacancy and collection allowance set forth above. A 10% administrative fee is $27,712. Reducing this amount by 12% produces $24,387, or approximately 1.7% of such effective gross income. I find, therefore, that a reduction in the management fee from 5% to 3% is appropriate.
Both appraisers deducted a leasing commission expense. The appraiser for the taxpayer used 3.75% of effective gross income and the appraiser for the municipality used 3% of effective gross income. The appraisers agreed that commissions are gener *208 ally 5% of basic rent for new leases. The taxpayer’s appraiser reduced the percentage to 3.75% because renewal commissions are not always payable. The municipality’s appraiser reduced the percentage to 3% because renewal commissions are generally lower than 5% and the owner can avoid payment of any commission by direct leasing. I find no proof that owner leasing is a realistic prospect for the subject shopping center and, therefore, accept 3.75% of effective gross income as the proper deduction for leasing commissions.
Both appraisers utilized 2% of effective gross income as the proper deduction for reserves, and I accept this percentage.
As noted above, the taxpayer’s appraiser deducted an expense for common area maintenance costs attributable to vacant space and space occupied by tenants in financial default. In determining this deduction, the appraiser noted that the common area maintenance costs for the subject shopping center, exclusive of any administrative fees, were $2.83 per square foot for 1994 and $1.91 per square foot for 1995. Insurance costs were 47$ per square foot for 1994 and 24$ per square foot for 1995. The appraiser also relied on the 1990 edition of Dollars and Cents of Shopping Centers which indicated a mean common area maintenance cost, exclusive of any administrative fee, of $2.21 per square foot. He concluded that $2.70 per square foot was the appropriate common area maintenance cost. The appraiser for the municipality relied on the 1993 edition of Dollars and Cents of Shopping Centers which indicated a mean common area maintenance cost of $2.50 per square foot. I find that $2.50 per square foot is the appropriate common area maintenance cost. The deduction for unreimbursed common area maintenance costs is the product of $2.50 per square foot multiplied by 110,848 square feet and then by 12% (the vacancy and collection loss allowance determined above) or $33,254.
The taxpayer’s appraiser also deducted a tenant improvement or fit-up allowance (i.e. an amount representing costs incurred by the landlord for interior improvements to tenant spaces *209 in connection with initial or renewal leasing). The taxpayer’s expert treated such allowance as an operating expense because, in his opinion, as new tenants take occupancy and as leases are renewed, the landlord, on a regular recurring basis, incurs costs for improvements to the leased spaces. The expert determined such costs to be $10 per square foot. He assumed a ten-year amortization period, and, therefore, deducted a tenant improvement expense of $1.00 per square foot or $110,848.
Tenant improvement costs may constitute an operating expense.
In certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made. If this work is performed at the landlord’s expense and is required to achieve market rent, the expense of these improvements should be included in the reconstructed operating statement as part of the replacement allowance.
[The Appraisal of Real Estate, supra, at 496.]
Capital expenditures, however, may not be deducted as an operating expense.
Expenditures for capital improvements do not recur annually and therefore should not be included in an estimate reflecting the typical annual expenses of operation. Capital improvements may enhance value by increasing the annual net operating income or economic life of the property, but the capital expenditure is not a periodic operating expense.
[Id. at 498.]
In RTC Properties v. Town of Kearny, 13 N.J.Tax 146, 156 (Tax 1993), Judge Crabtree specifically rejected a deduction for tenant improvement costs in the context of a tax appeal involving industrial property. However, in Morris Tp. v. LF Assocs., 12 N.J.Tax 87, 103 n. * (Tax 1991), Judge Lasser, found a $15 per square foot “tenant allowance” to be “customary and appropriate” in an office building context. In Hull Junction Holding Corp. v. Princeton Bor., 16 N.J.Tax 68, - (Tax 1996), I accepted the deduction of a tenant improvement allowance as an operating expense in a retail context where the appraisers for both parties made such deduction based on the particular conditions in the Princeton market.
Tenant improvement costs incurred by the landlord may be either capital expenditures or operating expenses. If the proofs establish that, in the relevant market, landlords customarily and regularly incur such costs, then deduction of such costs as an *210 operating expense is appropriate. Such deduction should be included in the replacement reserve as suggested by the language from The Appraisal of Real Estate quoted above.
The taxpayer’s proofs as to tenant improvement costs consisted of the testimony of its appraiser and the testimony of Mr. Ashok Mehra, the principal of plaintiff. The appraiser testified that landlords normally bear the cost of tenant improvements, but provided little factual support for this opinion. The comparable leases he used did not include landlord expenditures for tenant improvements, except the lease for a newly constructed Grand Union supermarket in Livingston, New Jersey. The expert could cite only the Foodtown supermarket lease and four satellite leases at the subject shopping center in support of deduction of this expense. He noted, that, in connection with the expansion and renovation of the Foodtown supermarket, the landlord incurred an interior improvement expense of approximately $3,400,000, exclusive of tenant fixtures. I do not accept this expenditure or the Grand Union supermarket expenditure as establishing that a tenant improvement allowance should be deducted. Major landlord expenditures in connection with the initial occupancy or the enlargement and complete renovation of the primary anchor tenant in a shopping center do not, in themselves, demonstrate that such expenditure would be incurred regularly as the supermarket tenant either renewed its lease or a new supermarket tenant occupied the space. In addition, at the time such expenditure was made with respect to the Foodtown supermarket at the subject center, the principal of the landlord was also the principal of Foodtown.
Four satellite leases in the subject shopping center reflected a landlord cost for tenant improvements. In a lease dated December 1, 1991, the landlord provided a $9.07 per square foot fit-up allowance; in a lease dated April 12,1993, the landlord provided a $2.50 per square foot fit-up credit; in a lease dated February 1, 1996, the landlord provided a $2.05 per square foot fit-up allowance; and in a lease dated February 1,1996, the landlord provided an $8.91 per square foot fit-up allowance plus $1.25 per square foot *211 for tile. These leases demonstrate only sporadic allowances and not a regularly recurring landlord expense. Even assuming that these four leases established that the tenant improvement allowance was a recurring cost and thus deductible as an operating expense, the dollar amounts of the fit-up allowances reflected by the leases do not provide convincing support for an allowance of $10 per square foot amortized over ten years.
Mr. Mehra, who is also the owner or a principal of the owner of a strip shopping center in Denville, New Jersey, testified that the tenant improvement allowance is a function of the market, ie. as occupancy increases the allowance from the landlord decreases. He further testified that the current (1996) typical tenant improvement allowance at the subject center is $5 to $9 per square foot amortized over a five-year lease term. Mr. Mehra’s entity acquired the center in January 1995, after the two assessing dates herein. His experience at the center may reflect unusual concessions in order to increase occupancy at the center as quickly as possible. In any event, his testimony does not support the conclusion of taxpayer’s expert that $10 per square foot is a regularly recurring landlord expense for tenant improvement work.
The appraiser for the municipality testified that no deduction should be made for a tenant improvement allowance because, in retail leasing, the tenant normally pays the costs of all improvements or fit-ups required for its occupancy beyond the cost of bringing the leasable area to a so-called “vanilla box” condition. “Vanilla box” construction encompasses only the following: installation of drywall partition walls; installation of a dropped ceiling with lighting; installation of bathroom plumbing; installation of heating, ventilating, and air conditioning ducts and registers; installation of electric service and outlets; and installation of floor covering consisting of one-half carpet and one-half tile.
The municipality’s appraiser acknowledged that some leases may contain a free rent period or rent concession in lieu of the landlord’s incurring a cost for tenant improvements. He testified, however, that his economic rent for the satellite stores took rent *212 concessions into account and that an additional deduction for a tenant improvement allowance would constitute a “double dip.” The expert further testified that his allowance of a 2% reserve was sufficient to include occasional tenant fit-up costs. He characterized such reserve as generous because leases at the subject shopping center include the cost of roof replacement (normally a landlord cost) as a common area maintenance cost reimbursed by tenants.
The municipality’s appraiser concluded that the tenant improvement allowance is a function of three factors: a) the quality of the tenant — the better the tenant the more the landlord will expend; b) the general strength of the shopping center — the stronger the shopping center the less the landlord will expend; and c) the general strength of the market — the stronger the market the less the landlord will expend. This analysis is consistent with my conclusion that a tenant improvement allowance or expense may be an appropriate operating expense deduction if, in the relevant market, the allowance or expense is a customary, regularly recurring landlord expense.
I find that the proofs are inadequate to establish that a tenant improvement allowance is such a customary, regularly recurring landlord expense in the strip shopping center market in which the subject property is located. I am not persuaded that rent concessions are solely a mechanism for landlords to reimburse tenants for improvement costs. Concessions could be a means of reducing the tenant’s financial burden during its business start-up period. Even if I found that the proofs established the tenant improvement allowance as a proper operating expense deduction, the proofs fail to establish the appropriate amount of such deduction. As set forth above, plaintiffs proofs are conflicting as to the amount of the allowance, and the proofs contain no market data establishing the appropriate duration or quantity of rent concessions attributable to tenant fit-up costs. Accordingly, I reject the deduction of an operating expense for tenant improvements because of the inadequacy of the proofs herein. *213 The appraiser for the municipality, although he rejected deductions for unreimbursed common area costs and a tenant fit-up allowance, did deduct a miscellaneous expense of 2% of effective gross income. The taxpayer’s appraiser made no such deduction. I find this deduction to be reasonable and accept it.
Having determined potential gross income, the vacancy and collection loss allowance and operating expenses, I turn to the determination of the appropriate capitalization rate. In making such determination, I have considered the negative factors affecting the subject shopping center, the vacancy and collection loss allowance which I selected at a level approximately double that indicated for similar centers, and the level of risk inherent in a mortgage loan to, and ownership of, the subject center.
Both appraisers used the band of investment technique for developing their respective capitalization rates. This technique includes a component reflecting the requirements of assumed mortgage financing, based on market factors, and a component reflecting the requirements of the equity investor. For the tax year 1994, both appraisers used an 8.25% interest rate for their mortgage component. Taxpayer’s appraiser assumed a twenty-year mortgage amortization period and the defendant’s appraiser assumed a twenty-five-year amortization period. Taxpayer’s appraiser assumed a 65% loan-to-value ratio and the municipality’s appraiser assumed a 70% ratio. I accept the appraisers’ determination as to the interest rate. With respect to the appropriate amortization period for the mortgage, I have reviewed the tables published by the American Council of Life Insurance (“ACLI”) for the third and fourth quarters of 1993. In particular, I have reviewed Table 8 under the heading “Retail $5,000,000 to $14,999,999,” Table 9 under the heading “Retail-Middle Atlantic,” Table 10 under the heading “Middle Atlantic-New Jersey” and Table 11 with respect to New York and Northern New Jersey. These tables reflect amortization periods ranging from sixteen to twenty-four years. The Appraiser News surveys for the third and fourth quarters of 1993 reflect amortization periods ranging from eleven to thirty years. With respect to *214 the appropriate loan-to-value ratio, the same ACLI tables reflect ratios of 66.7% to 80% and The Appraiser News surveys indicate a 67.3% to 69.3% ratio. I find that, for the tax year 1994, twenty years is the appropriate mortgage amortization period (producing a mortgage constant of 10.22%), and 70% is the appropriate loan-to-value ratio.
In order to determine the equity dividend rate for the tax year 1994,1 have reviewed the implied rates shown in the ACLI tables described above. These rates for the third and fourth quarter of 1993 range from 7.18% to 14.9%. The Appraiser News surveys for the third and fourth quarters of 1993 show going-in capitalization rates ranging from 8.5% to 10.5% with an average rate of 9.6%. The Korpacz Beal Estate Investors Survey for the fourth quarter of 1993 indicates a range of free and clear equity rates of 8.5% to 12% with an average of 9.86%. The Real Estate Research Corporation surveys for the third and fourth quarters of 1993 indicate going-in capitalization rates ranging from 8.5% to 10.5% with a 9.6% average. Taxpayer’s appraiser used an equity dividend rate of 11% and the municipality’s appraiser used 8.5%. I find the appropriate equity dividend rate to be 10%.
The basic capitalization rate for 1994 is, therefore, 10.15% [ (10.22% x 70%) + (10% x 30%) ].
For tax year 1995, both appraisers selected a mortgage interest rate of 9%, and I accept their selection. The taxpayer’s appraiser used a twenty-year amortization period and the municipality’s appraiser used twenty-five years. The ACLI tables for the third and fourth quarters of 1994 (using the same Tables described above) indicate amortization periods ranging from 16 to 22.15 years. The Appraiser News survey for the fourth quarter of 1994 indicates a range of 15 to 30 years. Such ACLI tables indicate a loan-to-value range of 64.6% to 74.2% and The Appraiser News survey indicates 75.2%. I find a 20-year amortization period (producing a mortgage constant of 10.8%) and a 70% loan-to-value ratio.
The implied equity dividend rates reflected in the aforesaid ACLI tables for the third and fourth quarter of 1994 range from *215 6.76% to 11.8%. The Korpacz Real Estate Investors Survey for each of the third and fourth quarters of 1994 indicates a range of 8.5% to 12% with an average of approximately 9.8%. The Real Estate Research Corporation survey for the third quarter of 1994 indicates a range of 9% to 11% with an average of 9.8%. The taxpayer’s appraiser used an 11% rate and the municipality’s appraiser used 8%. I again find 10% as the appropriate equity dividend rate.
The basic capitalization rate for 1995 is, therefore, 10.56% [ (10.8% x 70%) + (10% x 30%) ].
The taxpayer’s expert added to each of his basic capitalization rates a factor representing real estate taxes payable by the landlord attributable to vacant space and space occupied by tenants in financial default. The appraiser for the municipality added a tax factor based upon the cost of completion of previously unrented space (see discussion below) as a percentage of the total cost of construction of the shopping center. I find, and the municipality’s expert so conceded, that determining a tax factor on this basis is inconsistent with an appraisal based upon gross potential economic rents for the entire center. Accordingly, I reject the tax factor computation made by the municipality’s expert. The addition to a capitalization rate of a tax factor as determined by plaintiffs expert may be appropriate.
If proofs were presented that, in a net rent context, the landlord is responsible for real estate taxes attributable to vacant space or space occupied by tenants in financial default, the addition to the basic capitalization rate of a tax factor, equal to the effective tax rate multiplied by the vacancy and collection loss allowance, would appear to be appropriate.
[Hull Junction Holding Corp. v. Princeton Bor., supra, 16 N.J.Tax at - (citations omitted).]
The quoted language from the Hull Junction opinion requires proofs that the market (the source of the economic data used in the income approach analysis) demonstrates that the landlord, in a net rent context, is not reimbursed for real estate taxes attributable to vacant space and space in financial default. Market practice might be for leases to require tenants to pay a share of real estate taxes based upon their respective percentages of total *216 leased space as opposed to leasable space. Under this assumption, the landlord would receive full reimbursement for taxes regardless of vacancies. The two leases from the subject shopping center introduced into evidence indicate that each tenant was paying a slightly higher proportion of taxes than its respective proportion of leased space at the chopping center (one tenant, which occupies .88% of the shopping center, pays 1% of real estate taxes; • another tenant, which occupies 6.88% of the shopping center, pays 6.93% of real estate taxes). The two leases in evidence from comparable shopping centers do not clarify the issue. One such lease requires the tenant to pay a share of real estate taxes based upon its portion of the leasable area at the shopping center, and the other lease requires the tenant to pay an “equitable portion” of real estate taxes.
The proofs presented in the subject appeal do not demonstrate that, in the market, or even at the subject shopping center, the landlord is customarily responsible for taxes attributable to vacant space. The plaintiffs appraiser assumed such to be the fact, but he provided no proof in support of his assumption. His testimony did not include an analysis of the applicable provisions of leases at the subject shopping center or at comparable properties, or other data, establishing the landlord’s responsibility for such taxes. Accordingly, I reject the addition of a tax factor to the basic capitalization rates determined above.[1]
The foregoing analysis can be summarized as follows for both 1994 and 1995:
*217 INCOME
Supermarket — 39,700 square feet x $13.65 = $ 541,905
Large store — 10,523 square feet x $14.50 = 152,584
Small stores — 60,625 square feet x $16.00 = 970,000
Gross Potential Income $1,664,489
Less Vacancy and Collection Loss Allowance — 12%— $ 199,739
Effective Gross Income (EGI) $1,464,750
EXPENSES
Management — 3% of EGI . $43,943
Leasing Commissions — 3.75% of EGI $54,928
Reserves — 2% of EGI $29,295
Unreimbursed Common Area Maintenance Costs $33,254
Miscellaneous — 2% of EGI $29,295
Total $ 190,715
NET INCOME $1,274,035
For tax year 1994, $1,274,035 capitalized at 10.15% produces a value of $12,552,069. For tax year 1995, $1,274,035 capitalized at 10.56% produces a value of $12,064,725. These values are based upon economic rents for space improved to a “vanilla box” condition. As of October 1, 1993, 32,227 square feet of rentable space at the shopping center remained unfinished. As of October 1, 1994, the unfinished area was 31,252 square feet. A deduction is necessary, therefore, for the cost of improving such unfinished space to a “vanilla box” condition.
Plaintiff contends that a further reduction in value is appropriate based on a discounting of future rents because this unfinished space could not produce rent as of the assessment dates. I reject this contention for two reasons: 1) it conflicts with the concept of determining value based on gross potential rent for the subject property as if fully rented on the assessment dates, and 2) it introduces a discounted cash flow analysis. Once the *218 unfinished space is placed in rentable condition (which tax appeal valuation assumes has occurred as of the applicable assessment dates), the space can generate full rent. Discounting rental income to be generated by such space for the time necessary to complete the “vanilla box” improvements is, therefore, inappropriate. Furthermore, a discounted cash flow analysis, as applied to tax appeal proceedings, has been aptly described as “an amalgam of interdependent, attenuated assumptions of limited probative value.” University Plaza Realty Corp. v. City of Hackensack, supra, 12 N.J.Tax at 368. Even if I accepted plaintiffs contention, I could not determine the appropriate discounting because the record is barren of any proofs as to the time period required to complete the “vanilla box” improvements and as to the appropriate discount rate.
Only the municipality’s appraiser determined the cost of the “vanilla box” improvements to the unfinished space, and I accept his calculations. The appraiser determined that, as of October 1, 1993, such cost was $21.81 per square foot (including a 10% entrepreneurial profit) or $702,918, and, as of October 1,1994, was $22.55 per square foot (including a 10% entrepreneurial profit) or $704,595. Subtracting $702,915 from $12,552,069 leaves a net value for tax year 1994 of $11,849,154. Subtracting $704,595 amount from $12,064,725 leaves a net value for tax year 1995 of $11,360,130.
For both tax years 1994 and 1995, the assessment on the subject property was $6,170,600. For 1994 the Chapter 123 ratio was 51.47% and the upper limit of the common level range was 59.19%. $6,170,600 is 52.08% of $11,849,154. This percentage is within the common level range as defined in N.J.S.A. 54:l-35a(b). For 1995, the Chapter 123 ratio was 53.99% and the upper limit of the common level range was 62.09%. The assessment of $6,170,-600 is 54.32% of $11,360,130. This percentage is also within the common level range.
In accordance with N.J.S.A. 54:51A-6, judgments will be entered affirming the 1994 and 1995 assessments.

 If I were to utilize such a tax factor, it would be based upon the effective tax rate for each of the tax years under appeal multiplied by the vacancy and collection loss allowance of 12%. For 1994, the effective tax rate is 1.6%. Multiplying this by 12% produces 0.19% to be added to the basic capitalization rate. For 1995, the effective tax rate is 1.7%. Multiplying this by 12% produces 0.2% to be added to the basic capitalization rate. Excluding the tax factors from the capitalization rates does not effect the outcome of these appeals.