

Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

# 2nd Corrected Opinion Notice

## Date: June 21, 2018

**Lee S. Holtzman, Esq.**
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

**Martin Allen, Esq.**
DiFrancesco, Bateman, Kunzman,
Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

**From: Hon. Joshua D. Novin, J.T.C.**

**Re: Martindale Hubbell, Inc.- C/O Lexis Nexis v New Providence Borough**
**Docket number: 001776-2010, 000380-2011, 001947-2012, 001159-2014**

The attached corrected opinion replaces the version released on June 20, 2018. The Opinion has been corrected as noted below:

In paragraph 2, the 2014 tax year assessment has been reduced.



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

June 21, 2018[1]

Lee S. Holtzman, Esq.
Michael Rienzi, Esq.[2]
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Martin Allen, Esq.[3]
DiFrancesco, Bateman, Kunzman,
 Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

> Re:   Martindale Hubbell, Inc. - C/O Lexis Nexis v. New Providence Borough
>        Docket No. 001776-2010, 000380-2011, 001947-2012, and 001159-2014

Dear Mr. Holtzman and Mr. Allen:

This letter constitutes the court's opinion following trial of the local property tax appeals

filed by plaintiff, Martindale Hubbell, Inc. – C/O Lexis Nexis ("Martindale Hubbell").  Martindale

---

[1]  The court issued its opinion in these matters on June 12, 2018, however a typographical error
was subsequently discovered requiring entry of this corrected opinion on June 21, 2018.

[2] As of the date of this letter opinion, Michael Rienzi, Esq. is no longer associated with McCarter
& English, LLP.

[3] William T. Rogers, III, Esq. and Skoloff & Wolfe, P.C. represented New Providence Borough
at trial and in post-trial submissions.  Subsequent to conclusion of trial and submission of post-
trial briefs, Martin Allen, Esq. and DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum,
P.C. filed a substitution of attorney on behalf of New Providence Borough in these matters.

Hubbell challenges the 2010, 2011, 2012, and 2014 tax year assessments on its improved property located in New Providence Borough ("New Providence").

For the reasons stated more fully below, the court reduces the 2010, 2011, 2012, and 2014 tax year assessments.

## I. Procedural History and Findings of Fact

As of the valuation dates, Martindale Hubbell was the owner of the real property and improvements located at 121 Chanlon Road, New Providence, New Jersey (the "subject property"). The subject property is identified on New Providence's tax map as Block 221, Lot 6.

The subject property comprises a 6.504-acre rectangular shaped lot located at the intersection of Chanlon Road and Floral Avenue. The real property was improved with a four-story, Class A, steel frame and masonry panel 124,669 square foot building constructed in 1990.[4] The building was constructed for use by Martindale Hubbell as a single-tenanted corporate headquarters facility. The building's main entrance is located at grade-level and leads into an open four-story lobby atrium with a vaulted skylight ceiling, terrazzo tile flooring, and stained wood trim finishes. The lobby contains reception and waiting areas, two elevators, and two staircases which form the perimeter of the atrium on each floor, providing access throughout the building. Each floor of the building contains a mixture of offices and open-air cubicles. The building also contains a library/conference room, a cafeteria, a mail room, and a data/support center. The library/conference room is finished with stained wood paneled walls. The office areas are finished with carpeting, painted sheetrock walls, and acoustical tile drop ceilings with fluorescent lighting. The building is serviced by central heating and air conditioning units. The building is surrounded

---

[4] Martindale Hubbell's expert offered testimony that the building contained 120,000 square feet, consisting of a leasable area of 97,000 square feet and 23,000 square feet of "support space."

on two sides by a manicured lawn and landscaped areas.  The grade of the subject property slopes downward on two sides to the parking areas.  The building contains an asphalt-paved surface parking area with 346 spaces and 27 covered parking spaces.

The subject property is located in New Providence's LI – Light Industrial zoning district with permitted uses including commercial and corporate offices, laboratories (devoted to research, design or experimentation), and manufacturing, processing, producing or fabricating operations. Conditional uses in the district include planned commercial developments, professional offices, and child-care centers, etc.  Thus, operation of the subject property as a single-tenanted corporate headquarters is a legally conforming use.  The subject property is located in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

Martindale Hubbell filed timely complaints challenging the subject property's 2010, 2011, 2012, and 2014 tax year assessments.  The matters were tried to conclusion over several days.

During trial, Martindale Hubbell and New Providence each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the field of real property valuation (the "expert" or "experts").  Each expert prepared an appraisal report expressing an opinion of the true market value of the subject property as of the October 1, 2009, October 1, 2010, October 1, 2011, and October 1, 2013 valuation dates.

As of each valuation date, the subject property's tax assessment, implied equalized value, and each expert's value conclusion is set forth below:

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized value | Martindale Hubbell's expert | New Providence's expert |
|---|---|---|---|---|---|
| 10/1/2009 | $10,378,993 | 49.87% | $20,812,097 | $11,100,000 | $20,000,000 |
| 10/1/2010 | $10,378,993 | 50.94% | $20,374,937 | $12,000,000 | $21,000,000 |
| 10/1/2011 | $10,378,993 | 51.43% | $20,180,814 | $12,600,000 | $21,000,000 |
| 10/1/2013 | $10,378,993 | 51.84% | $20,021,205 | $12,700,000 | $22,000,000 |

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness. . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the

testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the plaintiff has overcome the presumption of validity. If the court concludes that a plaintiff has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According Martindale Hubbell all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that it produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of Martindale Hubbell's expert and the facts upon which he relied raise debatable questions regarding the correctness of the subject property's assessments for the 2010, 2011, 2012, and 2014 tax years.

However, concluding that the presumption of validity has been overcome does not equate to a finding that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

b. Highest and Best Use

In the court's pursuit to determine the true market value of a property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which

5

are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater Borough, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the property valuation process is discerning its highest and best use. Ford Motor Co., 10 N.J. Tax 153, 161. See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Twp. of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, Martindale Hubbell's expert concluded that the "As If Vacant" highest and best use of the subject property was to hold it for "future development of an office use," when economic conditions improved. However, recognizing that the subject property is currently improved with a four-story owner-occupied office building, Martindale Hubbell's expert concluded that the "existing office improvements" represent its highest and best use "As Improved."[5] [6]

---

[5] Martindale Hubbell's expert admitted during cross-examination that although his appraisal report was "silent" regarding the use contemplated by the "existing office improvements," his concluded highest and best use for the subject property was as a "multi-tenanted" office building, despite having been occupied as a single-tenanted office building during all tax years at issue.

[6] At trial, New Providence moved to strike Martindale Hubbell's expert's report as a net opinion arguing that he failed to adequately evaluate and analyze the highest and best use of the subject

6

New Providence's expert concluded that the "As Vacant" and "As Improved" highest and best use of the subject property was "for the continuation of its present use" as a single-tenanted office building.

    c.  Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Here, both experts relied on the income capitalization approach to derive an opinion of market value for the subject property. Additionally, New Providence's expert relied on the sales comparison or market approach to derive a supporting opinion of market value.[7]

---

property and therefore, his resulting conclusions of value were inherently flawed. The court denied New Providence's motion and placed a statement of reasons on the record.

[7] Martindale Hubbell's expert expressed his opinion that the sales comparison approach was not a reliable indicator of true value because all researched sale transactions involved the sale of a leased fee interest. Thus, in his opinion, would require additional lease, income, and expense information, and require material adjustments to derive a stabilized fee simple value.

7

1. Income Capitalization Approach

When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68 (Tax 1996). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). As Judge Hopkins succinctly stated, when deriving a value for property employing the income-capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Direct capitalization is a technique frequently employed by this court and valuation experts "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's Net Operating Income into an estimate of value.

8

a. <u>Below-the-Line/Above-the-Line Expense</u>

Significantly, when performing their income capitalization approaches the experts employed different formulas. Both experts determined an economic or market rent, and multiplied their concluded market rent by the leasable area to compute the subject property's Potential Gross Income.[8] Next, both experts computed a vacancy and collection loss rate and deducted it from the Potential Gross Income to discern Effective Gross Income. Both experts then applied a series of stabilized expenses to the Effective Gross Income to discern the subject property's Net Operating Income. Finally, the experts applied a base capitalization rate, plus an effective tax rate, to the Net Operating Income to discern an estimated value.

However, in computing Net Operating Income, New Providence's expert did not apply a stabilized expense factor for tenant improvements and leasing commissions. In his opinion, tenant improvements and leasing commissions should be viewed as capital expenditures, or as an investment of cash necessary to improve or acquire an asset. Thus, New Providence's expert considered leasing commissions and tenant improvement expenses as "below-the-line" expenses.[9]

A "below-the-line expense" is an expense "recorded 'below' the net operating income line in a reconstructed operating statement and therefore . . . not considered part of the total stabilized operating expense for the property." <u>The Appraisal of Real Estate</u>, at 475. Generally, "below-the-line" expenses include tenant improvement expenses, leasing commissions, and replacement

---

[8] New Providence's expert added tenant electric charges of $1.75 per square foot to the base rent in determining the subject property's Potential Gross Income. New Providence's expert then deducted stabilized utility expenses of $3.50 per square foot. The resulting net utility expense applied by New Providence's expert was $1.75 per square foot. Conversely, Martindale Hubbell's expert did not add tenant electric to the base rent, instead computing a net utility expense of $1.75 per square foot and deducting it as a stabilized utility expense.

[9] Both experts included replacement reserves as a stabilized operating expense when computing Net Operating Income and thus, did not treat replacement reserves as "below-the-line" expenses.

reserves. Conversely, an "above-the-line expense" is an expense "recorded 'above' the net operating income line in a reconstructed operating statement <u>typically developed for valuation purposes</u> and therefore is considered part of the total operating expenses for the property." <u>Ibid.</u> (emphasis added). Generally, "above-the-line" expenses include unreimbursed expenses such as property management, insurance, utilities, cleaning/janitorial, and repairs and maintenance.

There is no globally accepted practice for the handling of tenant improvements, leasing commissions, and replacement reserves in reconstructed operating statements. Moreover, the court finds no legal precedent in New Jersey endorsing the view that in office buildings replacement reserves, tenant improvements, and leasing commissions must be characterized as either "above-the-line" or "below-the-line" expenses.[10] Thus, the decision whether to include, or exclude, tenant improvements, leasing commissions, and replacement reserves as stabilized expenses when calculating Net Operating Income is a function of context and the intended user.

Proponents of the "above-the-line" method argue that accounting for replacement reserves, tenant improvements, and leasing commissions against Net Operating Income allows an owner to annually account for expenditures necessary to maintain the optimal rental status of a property. In <u>Matter of Reckson Operating Partnership v. Assessor of Town of Greenburgh</u>, 784 N.Y.S. 2d 923, 923 (N.Y. Sup. Ct. 2004), the court concluded that tenant improvement costs should "be treated

---

[10] As a general rule, in New Jersey replacement reserves, tenant improvements, and leasing commissions have been treated as "above-the-line" expenses when computing Net Operating Income. <u>See</u> <u>Litton Business Systems, Inc. v. Morris Plains Borough</u>, 8 N.J. Tax 520 (1986); <u>River Office Equities v. Twp. of Middletown</u>, 11 N.J. Tax 404 (Tax 1990); <u>Morris Twp. v. LF Assocs.</u>, 12 N.J. Tax 87, 103 n. 7 (Tax 1991); <u>Hull Junction Holding Corp.</u>, 16 N.J. Tax 68; <u>Pine Plaza Associates, L.L.C. v. Hanover Twp.</u>, 16 N.J. Tax 194, 199 (Tax 1996); <u>First Republic Corp. of Am. v. East Brunswick Borough</u>, 16 N.J. Tax 568 (Tax 1997); <u>American Cyanamid Co. v. Wayne Twp.</u>, 17 N.J. Tax 542 (Tax 1998); <u>TD Bank v. City of Hackensack</u>, 28 N.J. Tax 363 (Tax 2015). <u>But cf.</u> <u>RTC Properties v. Kearny Town</u>, 13 N.J. Tax 146, 156 (Tax 1993) (rejecting the deduction of tenant improvement expenses for an industrial building as being "capital in nature.")

10

as an 'above the line expense – [because] Tenant improvement costs are a recognized expense for space being re-tenanted in a building. . . [o]n a stabilized basis over the course of an investment an owner would recognize the need to fund tenant work and meet these expenditures when they arise." Conversely, advocates of the "below-the-line" method maintain that reserves and tenant improvements are by nature, capital expenditures, extending the life of the property and thus, must not be accounted for when calculating the property's Net Operating Income.

To illustrate how replacement reserves, tenant improvements, and leasing commissions can affect a capitalization rate, assume that a commercial rental property recently sold for $4,000,000. Rate 1 derives a capitalization rate employing the above-the-line approach, or a rate based on a property's Net Operating Income <u>after</u> deducting replacement reserves, tenant improvements, and leasing commissions.  Rate 2 derives a capitalization rate employing the below-the-line approach, or a rate based on a property's Net Operating Income <u>before</u> deducting replacement reserves, tenant improvements, and leasing commissions.

| | |
|---|---|
| Potential Gross Income | $500,000 |
| Less Vacancy & Collection Loss @ 10% | $ 50,000 |
| Effective Gross Income | $450,000 |
| | |
| Fixed Operating Expenses | $ 75,000 |
| Variable Operating Expenses | $ 50,000 |
| Total Operating Expenses | $125,000 |
| | |
| Net Operating Income ("below-the-line") | $325,000 = 8.125% Capitalization - Rate 2[11] |
| Less:   Replacement Reserves, TI, and | |
|           Leasing Commissions | $ 54,000 |
| Net Operating Income ("above-the-line") | $271,000 = 6.775% Capitalization - Rate 1[12] |

---

[11] Computed as follows: $325,000 (NOI) / $4,000,000 (Purchase Price) = 0.08125 or 8.125%.

[12] Computed as follows: $271,000 (NOI) / $4,000,000 (Purchase Price) = 0.06775 or 6.775%.

Thus, if replacement reserves, tenant improvements, and leasing commissions are deducted as "above-the-line" operating expenses, the reported capitalization rate for this transaction would be 6.775%. Conversely, if replacement reserves, tenant improvements, and leasing commissions were considered "below-the-line" expenses and not deducted, the reported capitalization rate for the transaction would be 8.125%. Accordingly, for property valuation purposes, a downward adjustment must be made to the "below-the-line" capitalization rate to account for replacement reserves, tenant improvement expenses, and leasing commissions.

As a general rule, multifamily dwelling mortgage lenders include reserves for replacements and leasing commissions in their calculation of estimated Net Operating Income when determining the maximum allowable loan amount.[13] [14] The rationale behind this concept is simple, one of the paramount goals of a lender is to minimize risk to the financial institution, and to ensure that a property has sufficient cash flow to service the debt. Thus, when a replacement reserve is included as an "above-the-line" expense in a multifamily dwelling mortgage financing transaction, it can significantly impact reported loan-to-value ratios, loan amounts, loan terms, and potentially interest rates.

In addition, there are a number of commercially available surveys and studies that furnish capitalization rates for different market segments. These surveys may elect to treat replacement reserves, tenant improvements, or leasing commissions as either "above-the-line" or "below-the-line" expenses. Thus, any individual or consumer relying on these data sources or surveys must be cautious not to blindly apply reported capitalization rates without first inquiring whether

---

[13] See U.S. Department of Housing and Urban Development – Multifamily Asset Management and Project Servicing handbook, 4350.1 REV-1, Chapter 4, Reserve Fund for Replacements. https://www.hud.gov/sites/documents/DOC_35335.PDF (last visited June 8, 2018)

[14] Generally, tenant improvement costs are not applicable to multifamily dwelling buildings.

replacement reserves, tenant improvements, or leasing commissions were considered as "above-the-line" or "below-the-line" expenses in the survey or study. If the data source did not consider replacement reserves, tenant improvements, or leasing commissions in calculating Net Operating Income, the user must make a downward adjustment to the reported capitalization rates to account for replacement reserves, tenant improvements, or leasing commissions, as applicable.

It is critical for the user of any publicly available, or privately gathered, data, surveys, studies, and information to know whether replacement reserves, tenant improvements, and leasing commissions were considered as "below-the-line" or "above-the-line" expenses. The reason why this is vital is that depending on how the data and information was compiled and is being used, may require its user to apply an appropriate upward or downward adjustment to account for replacement reserves, tenant improvements, and leasing commissions.

Here, the court is charged with determining the "full and fair value" of property, a phrase which has, in turn, been construed as the "true value" of a property. See N.J.S.A. 54:4-23; Hackensack Water Co. v. Div. of Tax Appeals, 2 N.J. 157, 162 (1949); New Brunswick v. State Div. of Tax Appeals, 39 N.J. at 543-44; ITT Continental Baking Co., 1 N.J. Tax at 252. Our courts have stated that:

> market value, a synonym for true value or full and fair value, is defined [as] . . . the most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
>
> [Presidential Towers v. City of Passaic, 6 N.J. Tax 406, 412 (Tax 1984) (quoting American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 33 (8th ed. 1983)).]

13

However, in the search for a property's market or true value, "[t]here can be no rigid rule. The answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area." New Brunswick v. State Div. of Tax Appeals, 39 N.J. at 544. A prudent investor, viewing property akin to a short-term equity investment, may capitalize a property's rental income at an appropriate yield without consideration of the costs associated with capital replacements. Stated differently, an investor may value a property based on the relationship that exists between the price paid for the asset and the annual rate of return on that investment. Conversely, a prospective purchaser viewing real property as a long-term investment, may elect to capitalize the property's Net Operating Income after including amounts for replacement reserves, tenant improvements, and leasing commissions, as may be required by the property's market area to keep it optimally occupied. Thus, in the court's journey to discern a property's true value, based on the stabilized fee simple interest of the property, the court concludes that neither an "above-the-line," nor "below-the-line" approach will necessarily produce a result inconsistent with the court's objective.

In sum, certain appraisers and valuation experts may elect to characterize tenant improvement costs, leasing commissions, and replacement reserves as capital expenses, while others consider tenant improvement costs, leasing commissions, and replacement reserves as ordinary operating expenses needed to maintain a property's occupancy and competitiveness in the marketplace. However, neither approach seemingly conflicts with this court's obligation to discern true or market value. Nonetheless, under either approach, replacement reserves, tenant improvements, and leasing commissions must be properly accounted for and allocated, either as "below-the-line" or "above-the-line" expenditures as they have a material impact on the true value of a property. As Justice Burling keenly observed, "mathematical calculations in appraisals,

14

though made in the best of faith, can lead to divergent results and should be closely scrutinized." Aetna Life Ins. Co., 10 N.J. at 106. Thus, when employing either public or private mortgage loan and capitalization rate data or information, it is crucial for the user to familiarize themselves with the data sources and data collection parameters and to apply adjustments to the data as necessary to produce consistent and reliable results.

    a.   Market Rent

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010).

Here, the fundamental difference between the experts' opinions of market value center on two issues: (1) valuing the subject property as a single-tenanted office building, or as a multi-tenanted office building; and (2) whether a portion of the ground level of the building, located partially below grade, should be valued differently from the remainder of the building.

New Providence's expert maintains that valuing the property as a single-tenanted office building is more appropriate because, as of each valuation date, the subject property was occupied by Martindale Hubbell as a single-tenanted corporate office headquarters.[15] In the opinion of New

---

[15] New Providence's expert acknowledged that the subject property was sold in 2014. In addition, during cross-examination he further conceded that during 2014 the building's occupancy was in a state of transition, being converted from a single-tenanted office building into multi-tenanted office building.

15

Providence's expert, the subject property's improvements and interior finishes are of a quality that is commensurate with other Class A office buildings in the area. Moreover, based on its current configuration, New Providence's expert posited that substantial costs would be incurred to convert the building from a single-tenanted office building into a multi-tenanted office building.

Conversely, Martindale Hubbell's expert contends that the quality of the construction, improvements, and finishes for the subject property is somewhat inferior to other single-tenanted office headquarter facilities in the market and is more akin to a multi-tenanted office building. In his opinion, the quality of the building is positioned between a Class A and a Class B office building. Martindale Hubbell's expert offered that as of the trial date, the building had been sold and converted by the new owner into a multi-tenanted office building without excessive costs.[16]

### 1. Martindale Hubbell's Expert

In the opinion of Martindale Hubbell's expert, the subject property is located in the "West Union County" and Somerset/I-78 office submarkets.[17] The expert performed a "peer group analysis" to identify other buildings he deemed competitive in the market area of the subject property, which he identified as other multi-tenanted office buildings in Berkeley Heights, Cranford, Mountainside, Clark, Bridgewater, and Millburn.

---

[16] Martindale Hubbell's expert did not offer any tangible evidence regarding the costs which would be incurred, or the costs that were actually incurred by the new owner to convert the building from a single-tenanted office building into multi-tenanted office building.

[17] Martindale Hubbell's expert expressed that the West Union County submarket consists of Berkeley Heights, Summit, Springfield, Union, Cranford, Kenilworth, Hillside, Mountainside, Westfield, Clark, and Scotch Plains. Martindale Hubbell's expert further explained that the Somerset/I-78 office submarket consists of two Union County municipalities (New Providence and Berkeley Heights), and ten Somerset County municipalities (Watchung, Warren, Bernardsville, Peapack-Gladstone, Bedminster, Bridgewater, Lyons, Martinsville, Pluckemin, and Lamington.)

Martindale Hubbell's expert identified sixteen office leases he considered reflective of market rent. The expert organized the leases into two groupings: (a) eight leases for the 2010 and 2011 tax years; and (b) eight leases for the 2012 and 2014 tax years. One office lease was deemed competitive and comparable for all four tax years. The leases bore commencement dates between April 2009 and October 2013, and ranged in leased area size from 1,798 square feet up to 69,168 square feet. In determining the effective rent under the leases, the expert computed the average rent of the lesser of: (i) the lease term, or (ii) the rent for the first five years of the lease, accounting for any free rent provided by the landlord. See First Republic Corp. of Am., 16 N.J. Tax at 578 (concluding that the technique of averaging rents payable over the life of a lease is "consistent with sound appraisal principles.")

The leases selected by Martindale Hubbell's expert were all gross plus tenant electric leases, where the landlord is responsible for utility costs associated with the building, however the tenant is responsible for its own electric charges. According to the expert, gross plus tenant electric leases are typical for office leases in the subject property's market area.

The expert then applied a series of adjustments to the leases to account for differences in physical characteristics (ranging from -5% to 10%), economic characteristics (ranging from -10% to 20%), and location (-15%). The physical characteristic adjustments were intended to account for differences in construction quality, amenities, market appeal, functional utility, effective age, and physical condition. The economic characteristic adjustments were intended to account for rent concessions and excessive tenant improvement allowances. A location adjustment was made to one of the leases to account for its perceived superior location to the subject property.

To determine if a tenant improvement allowance was excessive, the expert assumed a $20.00 per square foot tenant improvement allowance (or a $0.33 Tenant Improvement

17

Amount/PSF/per month) was customary for the subject's market area. He then analyzed the tenant improvement allowances in the comparable leases discerning a range of $5.00 to $36.45 per square foot per year. The expert then made either downward, or upward, percentage adjustments to the leases that afforded tenant improvement allowances in excess of, or less than, the $20.00 per square foot value. The resulting range, per square foot, of unadjusted rents and adjusted rents for the office leases are set forth as follows:

| Tax Year | 2010 | 2011 | 2012 | 2014 |
|---|---|---|---|---|
| Unadjusted Rents | $21.32 - $24.09 | $21.32 - $24.09 | $19.38 - $23.40 | $19.38 - $23.40 |
| Adjusted rents | $20.76 - $27.60 | $20.76 - $27.60 | $20.91 - $26.75 | $20.91 - $26.75 |

Based on the foregoing analysis, Martindale Hubbell's expert concluded a market rent, per square foot, for the subject property as follows:

| Tax Year | 2010 | 2011 | 2012 | 2014 |
|---|---|---|---|---|
| Market rent | $24.00 | $24.00 | $24.00 | $24.00 |

Martindale Hubbell's expert emphasized that the building contains 23,000 square feet of ground floor space being utilized as Martindale Hubbell's cafeteria, mailroom, and data/support center. He explained that this area contains lower quality finishes and is located partially below grade with limited windows. Accordingly, the expert applied a 20% discount to his concluded market rent to account for what he perceived was the lower utility of this area. Thus, the expert concluded a market rent of $19.20 ($24.00 x 80% = $19.20) for the approximately 23,000 square feet of partially below-grade level space.

## 2. New Providence's Expert

New Providence's expert similarly concluded that the subject property's competitive market area is "defined as the Interstate 78 corridor, which runs from Berkeley Heights in Union County to Clinton Township in Hunterdon County."

New Providence's expert identified twelve office leases he considered reflective of the market rent as of the valuation dates. Ten of the office leases were deemed competitive and comparable for more than one tax year. Ten of the leases were gross plus tenant electric, one of the leases was a gross lease with separately metered utilities, and one of the leases was a gross lease. In determining the effective rent under the leases, New Providence's expert similarly computed the average rent of the lesser of: (i) the lease term, or (ii) the rent for the first ten years of the lease, accounting for any free rent provided by the landlord. New Providence's expert similarly concluded that gross plus tenant electric leases are typical in the subject property's office market area.

The expert applied an adjustment to one of the leases to account for a difference in quality/condition (5%), and applied adjustments to three of the leases for changing market conditions (-5%). Although the twelve office leases relied on by New Providence's expert included tenant improvement allowances of $0.00 to $59.00 per square foot, and rental concessions of no free rent to eight months free rent, the expert made no adjustments to the leases to account for these differences. The resulting range of unadjusted rents and adjusted rents, per square foot, are set forth as follows:

| Tax Year | 2010 | 2011 | 2012 | 2014 |
|---|---|---|---|---|
| Unadjusted Rents | $25.68 - $30.17 | $23.21 - $28.66 | $23.21 - $28.66 | $23.21 - $27.84 |
| Adjusted rents | $26.96 - $30.17 | $23.21 - $28.66 | $23.21 - $28.66 | $23.21 - $27.84 |

Based on the foregoing analysis, New Providence's expert concluded a market rent, per square foot, for the subject property as follows:

| Tax Year | 2010 | 2011 | 2012 | 2014 |
|---|---|---|---|---|
| Market rent | $27.00 | $26.00 | $26.00 | $26.00 |

3. Conclusion

a. Single-tenanted office building

As stated above, the first step in discerning true market value is discerning a property's highest and best use. In performing a highest and best use analysis, a property "should be examined for all possible uses and that use which will yield the highest return should be selected." General Motors Corp., 22 N.J. Tax at 125 (internal quotations omitted). A strong consideration in the analysis is the actual use of the subject property. Ford Motor Co., 10 N.J. Tax at 167.

In determining whether the highest and best use of an office building is as single-tenancy or multi-tenancy, this court has considered expert analyses of a building's layout, design, use, cost/feasibility of conversion, and occupancy history. In Litton Business Systems, Inc., 8 N.J. Tax at 533-34, the Tax Court found that the three office buildings were designed for a single user's open office space, with no partitions to divide tenants, and with a limited number of elevators. Id. at 523-25. The property was used as plaintiff's corporate headquarters, and was never rented to other parties. Id. at 526. Agreeing with the defendant's expert that "the design and layout of the subject [was] not suitable for multi-tenant use because of insufficient lobby areas, the location of elevators and security problems," the court concluded that the properties were comparable to a good quality, single-occupancy office buildings. Id. at 533.

In American Cyanamid Co. v. Wayne Twp., 17 N.J. Tax 542 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000), the Tax Court concluded that the highest and best use of two former headquarters buildings, consisting of 430,521 square feet and 169,085 square feet, were "for occupancy by a single tenant in each of the two buildings." Id. at 551. In reaching this conclusion, the court considered the costs associated with converting the buildings into multi-tenanted use, including "removal of asbestos, removal of escalators and installation of new elevators, replacing

20

existing single-pane windows . . . , replacing the heating, ventilating and air conditioning systems, and installation of fire sprinklers." Id. at 549. The court also relied on testimony from a marketing, sales, and brokerage expert who expressed that a multi-tenant use was "impractical in the market," acknowledging that "the entire complex was designed for a single user . . . [and] a single user in each building was conceivable." Id. at 551.

Here, the experts agreed that the subject property was constructed for Martindale Hubbell and as of the October 1, 2009, October 1, 2010, October 1, 2011, and October 1, 2013 valuation dates was exclusively occupied by Martindale Hubbell, as its corporate headquarters. Thus, as of the respective valuation dates, the subject property was never occupied, used, marketed, or leased as a multi-tenanted office building. Martindale Hubbell's expert conducted no analysis and presented no evidence, other than vague general discussions with the subject property's new owner, regarding the costs associated with converting the building into multi-tenanted use. No tangible evidence was offered regarding the actual costs which would be incurred to convert the building, nor the adequacy of the fixtures, systems, and improvements for multi-tenanted use. Moreover, based on the experts' testimony, the court concludes that the building is of a high quality, and although modestly appointed, is not so lavishly designed, or fabricated for a special purpose to result in the inability to compare it to other single-tenanted office buildings in the market area. Thus, the court concludes that as of the respective valuation dates, the highest and best use of the subject property was as a single-tenanted office building.

b. Comparable leases

However, the court finds that several comparable leases relied on by Martindale Hubbell's expert and New Providence's expert must be excluded from consideration by the court.

21

First, the court excludes from consideration sixteen of Martindale Hubbell's comparable leases: 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17. The primary reason for this determination is that only comparable lease 2 and 18 contain leased areas that are greater than 50,000 square feet. In contrast, New Providence's expert relied on eleven office leases containing leased areas greater than 50,000 square feet. Closer examination of the foregoing sixteen Martindale Hubbell leases discloses leased areas ranging from 1,798 to 17,150 square feet. Here, the subject property comprises a 124,669 square foot single-tenanted office building. Thus, Martindale Hubbell's expert employed leases that are between 1.44% and 13.75% of the size of the subject property.

The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, at 121-122. The elements of comparison to be "considered in [a comparable] rental analysis are . . . physical characteristics - size, height, interior finish, functional layout, site amenities, etc." The Appraisal of Real Estate, at 466. In selecting elements of comparison, an appraiser must focus on those similarities and differences that affect value and account for those differences by making reasonable adjustments. By definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Thus, in establishing a property's market rent the offered rentals must be

22

competitive and comparative in the marketplace with the appraised property. It is pivotal that an appraiser establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." The Appraisal of Real Estate, at 390. Here, the court does not find the comparable rentals consisting of leased areas between 1,798 to 17,150 square feet are comparable to and competitive in the market with a single-tenanted office building consisting of 124,669 square feet. Accordingly, the court rejects Martindale Hubbell's comparable leases: 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17.[18]

Moreover, for substantially the same reasons, the court excludes from consideration New Providence's expert's comparable lease 8, containing a leased area of 24,411 or 19.58% the size of the subject property.

Additionally, the court's review of New Providence's expert's comparable lease 6 discloses it is located well outside the subject property's market area, as defined by both experts. Both experts explained that the subject property's market area includes Western Union County and select portions of Somerset and Hunterdon County. However, leases 6 is located in Livingston Township (Essex County), a municipality not identified by New Providence's expert as part of the subject property's market area. Moreover, neither the testimony, nor the appraisal report submitted by New Providence's expert offered any meaningful evidence that this property is comparable to and competitive in the market with the subject property. Additionally, the court observes that out of the twelve leases offered by New Providence's expert, the Livingston Township lease bears the highest effective average rental rate. Therefore, the court excludes from consideration New Providence's expert's comparable lease 6 as evidence of the market rent for the subject property.

---

[18] As discussed infra, the court accepts Martindale Hubbell's expert's comparable lease 2 and 18, consisting of a leasable area of 69,168 square feet, as evidence of market rent.

In "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as tenant improvement allowances. The cost of tenant improvement allowances are often built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474. Here, the experts agreed that tenant improvement allowances were common and customary in the subject property's market area.

Martindale Hubbell's expert expressed that during the tax years at issue, a $20.00 per square foot average tenant improvement allowance for a new 60-month lease term (or a $0.33 Tenant Improvement Amount/PSF/per month) was usual in the subject property's market area. Conversely, New Providence's expert expressed that "data at comparable properties show that new tenants are receiving an allowance of $30.00 per square foot."[19] The court finds Martindale Hubbell's expert's testimony more credible on this point and adequately supported by the record. Therefore, the court accepts a $0.33 Tenant Improvement Amount/per square foot/per month as reasonable and customary in the market area.[20]

However, because material differences exist in the tenant improvement allowances between the remaining twelve comparable leases, the court must account for this disparity. Although Martindale Hubbell's expert made adjustments to his comparable leases to account for

---

[19] However, New Providence's expert made no adjustments to any of his comparable leases to account for the differences in tenant improvement allowances afforded under the leases.

[20] The tenant improvement allowances in the remaining twelve leases ranged from $0.00 to $36.45 per square foot.

these differences, New Providence's expert did not. Therefore, the court adopts the formula employed by Martindale Hubbell's expert in accounting for these variances. That formula involves annualizing the difference in the tenant improvement allowances, per square foot, and applying the implied dollar value, per square foot, to the effective rental rate to determine the adjustment amount, either upward or downward. Expressed as a formula:

$$\text{Leased Square Footage} \times \text{TI Allowance} = \text{Total TI Amount} / \text{Lease Term (Months)} / \text{Leased Square Footage} = \text{TI Amount PSF/Month}$$

Thus, applying the foregoing formula to Martindale Hubbell's comparable leases 2 and 18 and to New Providence's comparable leases 1, 2, 3, 4, 5, 7, 9, 10, 11, and 12 produces the following adjusted rents:

| Comparable Lease | TI Allowance | Effective Avg. Rent | TI Amount PSF/Month | Adjustment percentage[21] | Adjusted Rent |
|---|---|---|---|---|---|
| (NP) 1 & 9 | $ 0.00 | $26.58 | $0.00 | 15% | $30.57 |
| (NP) 2 & 10 | $42.00 | $23.21 | $0.50 | -10% | $20.89 |
| (NP) 3 & 11 | $35.00 | $23.83 | $0.49 | -10% | $21.45 |
| (NP) 4 & 12 | $46.50 | $26.31 | $0.26 | 5% | $27.63 |
| (NP) 5 | $20.00 | $25.68 | $0.15 | 10% | $28.25 |
| (NP) 7 | $ 0.00 | $28.50 | $0.00 | 15% | $32.78 |
| (MH) 2 & 18 | $36.45 | $23.23 | $0.55 | -10% | $20.91 |

Accordingly, application of these adjustments discloses the following range of unadjusted and adjusted market rents for the remaining seven comparable leases:

| Tax Year | 2010 | 2011 | 2012 | 2014 |
|---|---|---|---|---|
| Unadjusted Rents | $23.21 - $28.50 | $23.21 - $28.50 | $23.21 - $28.50 | $23.21 - $26.58 |
| Adjusted Rents | $20.89 - $32.78 | $20.89 – $32.78 | $20.89 - $32.78 | $20.91 - $30.57 |

---

[21] Adjustments were made based the annualized difference between the actual tenant improvement allowance psf/per month and the accepted market rate of $0.33 psf/per month. For example, New Providence's comparable lease 2 and 10 reported a TI/psf/per month of $0.50, resulting in a difference of $0.17 psf/per month, or $2.04 psf/per year. Thus, dividing the $2.04 TI/psf/per year by the $23.21 psf effective rent reveals an adjustment of .09%, rounded to 10%. ($0.50 - $0.33 = $0.17 x 12 months = $2.04 psf/per year / $23.21 psf = .09%)

The mean of the adjusted rents of the twelve comparable leases is $25.33. Therefore, the court concludes a market rent of $25.50 for the subject property, as of the October 1, 2009, October 1, 2010, October 1, 2011, and October 1, 2013 valuation dates.

Significantly, the court finds a lack of support in the record for Martindale Hubbell's expert's conclusion that a "20% discount" should be applied to the estimated 23,000 square feet of partially below grade area, "in consideration of this space's lower utility." Martindale Hubbell's expert did not identify any comparable rentals containing leased areas either partially below grade or as having a less favorable utility. Thus, Martindale Hubbell's expert offered no objective market data in a single-tenanted office building a partially below-grade area will command a rental rate 20% lower than other areas of the same building. Here, credible testimony was offered by the experts that during all tax years at issue Martindale Hubbell made effective use of the ground-floor area of the subject property as a lobby, employee cafeteria, and for ancillary support services. Accordingly, the court does not accord the approximately 23,000 square feet of partially below grade area in the subject property any discounted market rental value.

b. Vacancy and Collection Loss

Based on his analysis of absorption rates and vacancy statistics, published in the REIS Office Market Report for the year ending 2009 and the 3rd quarter 2010, 2011, and 2013, Martindale Hubbell's expert concluded that the subject property's sub-market was "stagnant" during the tax years at issue.[22] Moreover, after considering the vacancy rates of the office buildings identified in his Peer Group analysis, and CoStar Office Reports in the Somerset/I-78 office submarket, Martindale Hubbell's expert concluded that vacancy rates were stable during the tax

_____

[22] REIS is a respected commercial real estate data collection and market analysis firm. The data collected is commercially available, widely circulated and frequently relied upon by professionals in the real property valuation field.

26

years at issue. Therefore, Martindale Hubbell's expert concluded a vacancy and collection loss rate of 12% of Potential Gross Income.

Conversely, New Providence's expert expressed that based on his examination of properties in the subject property's market area, a stabilized vacancy rate of 10% of Potential Gross Income should be applied. However, New Providence's expert did not identify the properties that he considered, nor offer evidence of the vacancy rates disclosed during such analysis.

The court's review of the REIS Office Market Report for West Union County discloses a vacancy rate range for Class A office buildings of 21% to 23.7% during the 2009 through 2011 tax years. Moreover, Martindale Hubbell's expert's Peer Group analysis discloses average vacancy rates of 12.3% to 24.4% during the 2009 through 2013 tax years. Thus, the court accepts Martindale Hubbell's expert's proposed vacancy rate of 12% of Potential Gross Income and finds that is supported by credible evidence in the record.

c. Building Size

In Martindale Hubbell's expert's opinion, the building comprises 120,000 square feet. However, cross-examination revealed that Martindale Hubbell's expert did not examine the subject property's assessment record card or measure the building, instead relying on the representations of his client regarding its size. Moreover, the expert further acknowledged during cross-examination that "even though I have seen other measurements for the building," he nevertheless concluded a building size of 120,000 square feet.

Conversely, New Providence's expert credibly testified that based on a prior tax appeal in this matter and his examination of "information on the property record card in the tax assessor's office," the building consists of 124,669 square feet with "average floor plates [of] about 31,000 square feet" each.

The court finds New Providence's expert's testimony to be more credible evidence of the building size. Accordingly, the court concludes that the building contains 124,669 square feet.

d. Management Expenses

Both Martindale Hubbell's expert and New Providence's expert employed a management expense of 3% of Effective Gross Income. Based on the testimony offered by the experts, the court finds a management expense of 3% of Effective Gross Income to be reasonable.

e. Leasing Commissions & Operating Expenses

Although both experts treated replacement reserves as "above-the-line" expenses in determining Net Operating Income, the experts employed different approaches with respect to leasing commissions and tenant improvement expenses. Martindale Hubbell's expert considered leasing commissions and tenant improvement expenses as "above-the-line" expenses, grouping them into the stabilized operating expenses when computing Net Operating Income. Conversely, New Providence's expert considered leasing commissions and tenant improvement expenses as "below-the-line" expenses, adjusting his overall capitalization rate downward to account for these expenses.

However, because this court has traditionally embraced the view that reserves, tenant improvement expenses (if required to realize market rent), and leasing commissions should be deducted as "above-the-line" expenses, New Providence's expert also prepared a reconstructed operating statement for the subject property reflecting leasing commissions and tenant improvement expenses as "above-the-line" expenses.

As previously stated, the court finds that neither the "above-the-line," nor the "below-the-line" approach produces a result inconsistent with this court's objective of determining the true or fair market value of a property as of October 1st of the pretax year. However, it is critical that the

28

user or consumer of any commercially available capitalization rate or mortgage rate surveys, studies, information, or data know whether replacement reserves, tenant improvements, and leasing commissions were considered as "below-the-line" or "above-the-line" expenses. Without this information, the user or consumer would be unable to gauge whether the reported range of capitalization rates require adjustments to account for replacement reserves, tenant improvement expenses, or leasing commissions, and thus may overstate or understate the market capitalization rate.

Here, for purposes of ease of comparison, the court will consider the replacement reserves, tenant improvement expenses, and leasing commissions as "above-the-line" expenses in comparing and contrasting the expert's stabilized expenses, Net Operating Income and Capitalization Rates.

## 1. Leasing Commissions

In the opinion of Martindale Hubbell's expert, "any owner of the . . . subject property would anticipate paying a leasing commission" in order obtain and retain tenants to occupy the building. In his opinion, inclusion of a leasing commission expense was "necessary to stabilize the income stream, [and] it's an expense the landlord would expect to make." In his opinion, based on his experience as a licensed New Jersey real estate salesperson, a 5% leasing commission is reasonable and customary in the marketplace. Accordingly, Martindale Hubbell's expert employed a leasing commission expense of 5% of Effective Gross Income.

Similarly, New Providence's expert concluded that a leasing commission expense of 5% of the aggregate contract rent is customary for the market area. Therefore, in computing leasing commissions it as an "above-the-line" expense he deducted 5% of Effective Gross Income.

29

Based on the testimony offered by the experts, the court finds a leasing commission expense of 5% of Effective Gross Income to be reasonable.

## 2. Operating Expenses

Both experts analyzed operating expense statements from other office buildings that they found comparable to the subject property and consulted industry surveys and studies. Martindale Hubbell's expert relied on operating statements from eight office buildings, between 2008 and 2013, ranging in size from 38,864 square feet to 506,473 square feet. New Providence's expert relied on operating statements from two office buildings, between 2007 and 2010, consisting of 169,962 square feet and 305,380 square feet. Martindale Hubbell's expert analyzed surveys published by the Building Owners and Management Association ("BOMA"), for the period 2008 to 2013. Conversely, New Providence's expert analyzed studies published by the Institute of Real Estate Management ("IREM"), for the period 2009 to 2014.

Based on the foregoing comparison and analysis, Martindale Hubbell's expert determined stabilized operating expenses, as of each valuation date, of the following: (i) insurance at $0.25 per square foot; (ii) utility expenses (net of tenant electric) at $1.75 per square foot; (iii) repairs/maintenance at $2.00 per square foot; (iv) cleaning/janitorial at $1.50 per square foot; and (v) general/administrative $0.35 per square foot.

Conversely, New Providence's expert determined stabilized operating expenses, as of each valuation date, of the following: (i) insurance at $0.15 per square foot; (ii) utility expenses at $3.50 per square foot (inclusive of tenant electric at $1.75 per square foot); (iii) repairs/maintenance at $2.10 per square foot; (iv) cleaning/janitorial at $0.95 per square foot; and (v) general/administrative $0.55 per square foot.

The foregoing summary reveals the closely aligned stabilized operating expenses discerned by both experts. With two exceptions, the court finds Martindale Hubbell's expert's operating expenses to be credible and more representative of the stabilized market expenses for the subject property. The court finds that Martindale Hubbell's insurance expense and cleaning/janitorial expenses require minor downward adjustments.

First, the court's review of the subject property's historical operating expenses reveals no reported insurance expenses for the 2011, 2012, and 2013 tax years. Moreover, the court's review of the BOMA and IEM surveys reveals an insurance expense range of $0.16 to $0.23 per square foot during the 2008 through 2014 tax years. Thus, the court will employ a stabilized insurance expense of $0.20 per square foot. Second, based on the court's review of the experts reproduced operating statements, disclosing a range of cleaning/janitorial services between $0.72 and $1.74 per square foot, and the BOMA surveys, disclosing a range of cleaning/janitorial services between $1.15 and $1.39, the court will employ a cleaning/janitorial expense of $1.25 per square foot.

Additionally, as stated above, in computing his tenant improvement allowance, Martindale Hubbell's expert reviewed surveys of market participants and competitive leases in the market area to discern the range of values in both new leases and lease renewals. Based on his review and analysis, Martindale Hubbell's expert discerned that tenant improvement allowances ranged from $0.00 to $36.45 per square foot for new leases, and from $0.00 to $27.96 per square foot for lease renewals. His review of market participant surveys revealed a range of $20.00 to $30.00 per square foot, for new leases, and range of $0.00 to $10.00 per square foot, for lease renewals. Thus, Martindale Hubbell's expert assumed a tenant improvement cost allowance of $20.00 per square foot for new leases and $5.00 per square foot for renewal leases. Martindale Hubbell's expert then reviewed PWC's renewal probability surveys for the 3rd quarter 2008 through the 3rd quarter 2013.

31

His analysis of these surveys disclosed the likelihood of a lease being renewed ranged from 60% to 75%. Based on these rates, Martindale Hubbell's expert calculated a stabilized tenant improvement cost allowance of $2.20 per square foot.[23]

Conversely, in New Providence's expert's opinion, based on his analysis of the comparable rentals contained in his appraisal report, tenant improvement allowances were on average $30.00 per square foot for new leases and $10.00 per square foot for renewal leases. He further estimated that the typical lease term was 10 years and the renewal probability of a new lease was 25%, while he estimated the renewal probability of a renewed lease to be 75%. Thus, New Providence's expert determined a stabilized tenant improvement cost allowance of $1.50 per square foot.

The court finds Martindale Hubbell's expert's tenant improvement allowances, renewal probabilities and average lease term to be adequately supported by the record. Accordingly, the court accepts Martindale Hubbell's tenant improvement cost allowance of $2.20 per square foot.

Finally, Martindale Hubbell's expert stabilized replacement reserves at 1% of Effective Gross Income, or approximately $0.20 per square foot. To discern this amount, Martindale Hubbell's expert consulted PWC surveys of National Suburban Office Market for the 3rd quarter 2008 through the 3rd quarter 2013. Conversely, New Providence's expert stabilized replacement reserves at 2% of Effective Gross Income based on "[t]ypical reserve costs." The court's review of the PWC survey data discloses replacement reserves during the tax years at issue between $0.10 and $1.00 per square foot. The court finds a replacement reserve allowance of 1% of Effective Gross Income, or approximately $0.20 per square foot, to be reasonable in this matter and

---

[23] Martindale Hubbell's expert assumed a renewal probability of 40% for new leases and 60% for renewal leases, to calculate a weighted average of $11.00 per square foot. He further assumed an average lease term of five years to derive his stabilized tenant improvement cost of $2.20 per square foot per year ($11.00 / 5 = $2.20).

supported by the record.  Therefore, the court will apply a stabilized replacement reserve expense of 1% of Effective Gross Income.

### f.  Capitalization

Here, in deriving their overall capitalization rates, both experts consulted investor surveys and employed the Band of Investment technique.  The investor surveys are completed by market participants engaged in real estate financing transactions during given time periods.  The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc.  The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.'  The technique includes both a mortgage and an equity component."  Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal of Real Estate, at 467).  In employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'"  Id. at 82 (quoting Glen Wall Assocs., 99 N.J. 265, 279-80 (1985)).

Both experts reviewed PWC National Suburban Office Market surveys for the 3rd quarter 2009 through the 3rd quarter 2013.  The experts also both consulted the American Council of Life Insurers ("ACLI") Commercial Mortgage Commitments for the 3rd quarter 2009 through 3rd quarter 2013 to gauge the market contract interest rates and loan-to-value ratios.  "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance."  Hull Junction Holding Corp., 16 N.J. Tax at 82-83.  "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey."  Id. at 83.  By scrutinizing and "analyzing this data in toto, the court can make a reasoned

determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

Martindale Hubbell's expert also examined and analyzed the Viewpoint National Suburban Office survey, an investor survey prepared by Integra Realty Resources, containing capitalization rates for sales of institutional grade property.

New Providence's expert also analyzed and considered Real Estate Research Corporation's ("RERC") Regional Investment Criteria for First-Tier Investment Properties and Second-Tier Investment Properties for the 3rd quarter 2009 through 3rd quarter 2013.

In performing the Band of Investment technique to derive estimated capitalization rates, both experts reviewed and consulted ACLI's Commercial Mortgage Commitments for the 3rd quarter 2009 through 3rd quarter 2013. In addition, Martindale Hubbell's expert reviewed RealtyRates.com for a survey of equity dividend rates.

The below table contains a comparison of the Band of Investment techniques employed by the experts to derive a capitalization rate, including the loan to value ratios, interest rates, amortization periods, equity dividend rates:

|  | 2010 | | 2011 | | 2012 | | 2014 | |
|---|---|---|---|---|---|---|---|---|
| Martindale Hubbell's expert | LTV | 60% | LTV | 60% | LTV | 60% | LTV | 55% |
|  | Interest | 7.25% | Interest | 5.25% | Interest | 4.75% | Interest | 4.00% |
|  | Amort. | 25 yrs. | Amort. | 25 yrs. | Amort. | 25 yrs. | Amort. | 25 yrs. |
|  | EDR | 10.00% | EDR | 10.00% | EDR | 9.00% | EDR | 9.00% |
|  | Cap Rate | 9.25% | Cap Rate | 8.25% | Cap Rate | 7.75% | Cap Rate | 7.50% |
| New Providence's expert | LTV | 65% | LTV | 60% | LTV | 60% | LTV | 65% |
|  | Interest | 7.25% | Interest | 5.50% | Interest | 5.00% | Interest | 4.75% |
|  | Amort. | 25 yrs. | Amort. | 25 yrs. | Amort. | 25 yrs. | Amort. | 25 yrs. |
|  | EDR | 9.00% | EDR | 8.50% | EDR | 8.50% | EDR | 6.50% |
|  | Cap Rate | 8.79% | Cap Rate | 7.82% | Cap Rate | 7.61% | Cap Rate | 6.72% |

After reconciling the range of capitalization rates revealed in the investor surveys with the capitalization rates derived from the Band of Investment technique, the experts determined the following overall base capitalization rates for the subject property for each tax year at issue:

34

|  | 2010 | 2011 | 2012 | 2014 |
|---|---|---|---|---|
| Martindale Hubbell's expert | 9.25% | 8.25% | 7.75% | 7.50% |
| New Providence's expert[24][25] | 7.05% | 6.14% | 5.96% | 5.44% |

After computing their base capitalization rates, both experts added or "loaded" a tax factor to each valuation year to derive an overall capitalization rate. The tax factor represents the real estate taxes payable by Martindale Hubbell arising from operation of the subject property.

The court has considered the testimony of Martindale Hubbell's expert and New Providence's expert and has reviewed the supporting surveys, data, and Band of Investment calculations. The court emphasizes that the PWC National Suburban Office Market survey discloses an average overall capitalization rate for institutional grade property of: (a) 8.72% in the 3rd quarter 2009; (b) 8.40% in the 3rd quarter 2010; (c) 7.47% in the 3rd quarter 2011; and (d) 7.51% in the 3rd quarter 2013.[26] Accordingly, the court concludes that the following capitalization rates should be applicable to the subject property, and applied to its Net Operating Income:

| 2010 | 2011 | 2012 | 2014 |
|---|---|---|---|
| 8.10% | 7.75% | 7.00% | 6.75% |

---

[24] These capitalization rates represent an original base capitalization rate, less a capitalization rate adjustment to account for leasing commissions and tenant improvement allowance costs as "below-the-line" expenses.

[25] New Providence's expert offered testimony during trial that based on his communications with survey providers the survey participants generally consider tenant improvements costs and leasing commissions as "below-the-line" expenses. Therefore, he made a downward adjustment of between 1.56% to 1.75% to the capitalization rates reported in the surveys to account for tenant improvement costs and leasing commissions.

[26] New Providence's expert expressed that the capitalization rates reported in the PWC investor surveys consider tenant improvement costs and leasing commissions as "below-the-line expenses." Accordingly, New Providence's expert advocated that a downward adjustment must be made to the investor survey capitalization rates to account for tenant improvements and leasing commissions.

For the reasons set forth above, the court finds the true value of the subject property, under the income-capitalization approach, to be: $15,577,968 for the 2010 tax year, $15,971,749 for the 2011 tax year, $17,150,988 for the 2012 tax year, and $17,320,241 for the 2014 tax year.

**2010 Tax Year**

INCOME:

| | | |
|---|---|---|
| Office | $25.50 (Modified Gross) @ 124,669 sq. ft. | $ 3,179,060 |
| TOTAL: | POTENTIAL GROSS INCOME | $ 3,179,060 |
| LESS: | Vacancy & Collection Loss          @ 12% PGI | ($   381,487) |
| TOTAL: | EFFECTIVE GROSS INCOME | $ 2,797,573 |

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 124,669 sq. ft. | $ 24,934 |
| Utilities | @ $1.75 x 124,669 sq. ft. | $218,171 |
| Repairs/Maintenance | @ $2.00 x 124,669 sq. ft. | $249,338 |
| Cleaning/Janitorial | @ $1.25 x 124,669 sq. ft. | $155,836 |
| Tenant Improvements | @ $2.20 x 124,669 sq. ft. | $274,272 |
| General/Administrative | @ $0.35 x 124,669 sq. ft. | $ 43,634 |
| Management | @ 3% of EGI | $ 83,927 |
| Leasing Commissions | @ 5% of EGI | $139,879 |
| Replacement Reserves | @ 1% of EGI | $ 27,976 |

| | |
|---|---|
| TOTAL: EXPENSES | ($ 1,217,967) |
| NET OPERATING INCOME | $ 1,579,606 |

| | |
|---|---|
| Capitalization Rate | 8.10% |
| Plus: Effective Tax Rate | 2.04% |
| TOTAL CAPITALIZATION RATE | 10.14% |

| | |
|---|---|
| INDICATED VALUE | $15,577,968 |

**2011 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $25.50 (Modified Gross) @ 124,669 sq. ft. | | $ 3,179,060 |
| TOTAL: | POTENTIAL GROSS INCOME | | $ 3,179,060 |
| LESS: | Vacancy & Collection Loss | @ 12% PGI | ($   381,487) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $ 2,797,573 |

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 124,669 sq. ft. | $  24,934 |
| Utilities | @ $1.75 x 124,669 sq. ft. | $218,171 |
| Repairs/Maintenance | @ $2.00 x 124,669 sq. ft. | $249,338 |
| Cleaning/Janitorial | @ $1.25 x 124,669 sq. ft. | $155,836 |
| Tenant Improvements | @ $2.20 x 124,669 sq. ft. | $274,272 |
| General/Administrative | @ $0.35 x 124,669 sq. ft. | $  43,634 |
| Management | @ 3% of EGI | $  83,927 |
| Leasing Commissions | @ 5% of EGI | $139,879 |
| Replacement Reserves | @ 1% of EGI | $  27,976 |
| TOTAL: EXPENSES | | ($ 1,217,967) |
| NET OPERATING INCOME | | $ 1,579,606 |

| | |
|---|---|
| Capitalization Rate | 7.75% |
| Plus: Effective Tax Rate | 2.14% |
| TOTAL CAPITALIZATION RATE | 9.89% |

INDICATED VALUE $15,971,749

**2012 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $25.50 (Modified Gross) @ 124,669 sq. ft. | | $ 3,179,060 |
| TOTAL: | POTENTIAL GROSS INCOME | | $ 3,179,060 |
| LESS: | Vacancy & Collection Loss | @ 12% PGI | ($    381,487) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $ 2,797,573 |

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 124,669 sq. ft. | $  24,934 |
| Utilities | @ $1.75 x 124,669 sq. ft. | $218,171 |
| Repairs/Maintenance | @ $2.00 x 124,669 sq. ft. | $249,338 |
| Cleaning/Janitorial | @ $1.25 x 124,669 sq. ft. | $155,836 |
| Tenant Improvements | @ $2.20 x 124,669 sq. ft. | $274,272 |
| General/Administrative | @ $0.35 x 124,669 sq. ft. | $  43,634 |
| Management | @ 3% of EGI | $  83,927 |
| Leasing Commissions | @ 5% of EGI | $139,879 |
| Replacement Reserves | @ 1% of EGI | $  27,976 |
| TOTAL: EXPENSES | | ($ 1,217,967) |
| NET OPERATING INCOME | | $ 1,579,606 |

| | |
|---|---|
| Capitalization Rate | 7.00% |
| Plus: Effective Tax Rate | 2.21% |
| TOTAL CAPITALIZATION RATE | 9.21% |

INDICATED VALUE $17,150,988

**2014 Tax Year**

INCOME:

| | | |
|---|---|---|
| Office | $25.50 (Modified Gross) @ 124,669 sq. ft. | $ 3,179,060 |
| TOTAL: | POTENTIAL GROSS INCOME | $ 3,179,060 |
| LESS: | Vacancy & Collection Loss @ 12% PGI | ($ 381,487) |
| TOTAL: | EFFECTIVE GROSS INCOME | $ 2,797,573 |

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 124,669 sq. ft. | $ 24,934 |
| Utilities | @ $1.75 x 124,669 sq. ft. | $218,171 |
| Repairs/Maintenance | @ $2.00 x 124,669 sq. ft. | $249,338 |
| Cleaning/Janitorial | @ $1.25 x 124,669 sq. ft. | $155,836 |
| Tenant Improvements | @ $2.20 x 124,669 sq. ft. | $274,272 |
| General/Administrative | @ $0.35 x 124,669 sq. ft. | $ 43,634 |
| Management | @ 3% of EGI | $ 83,927 |
| Leasing Commissions | @ 5% of EGI | $139,879 |
| Replacement Reserves | @ 1% of EGI | $ 27,976 |
| TOTAL: EXPENSES | | ($ 1,217,967) |
| NET OPERATING INCOME | | $ 1,579,606 |

| | |
|---|---|
| Capitalization Rate | 6.75% |
| Plus: Effective Tax Rate | 2.37% |
| TOTAL CAPITALIZATION RATE | 9.12% |

INDICATED VALUE                                $17,320,241

## 2. Sales Comparison Approach

As stated above, New Providence's expert also employed the sales comparison approach to derive an estimated market value for the subject property as of the October 1, 2009, October 1, 2010, October 1, 2011, and October 1, 2013 valuation dates.

The sales comparison approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties," requiring the valuation expert to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." The Appraisal of Real Estate, at 378. The sales comparison is based on the principle that "an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate, at 377. When suitable comparative and competitive "data is available, this [approach] is the most

straightforward and simple way to explain and support an opinion of market value." Greenblatt, 26 N.J. Tax at 53. Thus, the usefulness of the sales comparison approach is dependent upon the sufficiency of the data on recent market transactions.

A substantial similarity must exist between the property being valued and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b. 4 N.J. Tax 528 (App. Div. 1981). An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." The Appraisal of Real Estate, at 390. Hence, the probative value of the comparable analysis hinges upon the similarities which can be drawn and the objective market data utilized to support any adjustments thereto.

Here, New Providence's expert identified six Class A office buildings or office campuses that sold between 2006 and 2013 that he deemed comparable to the subject property. The building area of the six sales ranged from 137,731 to 320,274 square feet, and lot sizes ranged from 15.28 acres to 41.78 acres. One sale was located in Union County, one sale was located in Morris County, and four sales were located in Somerset County.

The expert applied a +10% sale condition adjustment to one sale; and a -10% market condition adjustment to two sales. No other adjustments were made by New Providence's expert. The resulting adjusted sale price range was $164.15 to $236.77 per square foot. Ultimately, New Providence's expert concluded a value of $180.00 per square foot. Applying the $180.00 per square foot value to the subject property's 124,669 square feet resulted in an estimated market value of $22,440,000 for the subject property.

39

However, New Providence's expert's testimony and appraisal report disclosed that each of the six comparable sales represented the sale of a "leased fee" property interest, not a fee simple interest. In fact, the adjustment grids contained in New Providence's expert's appraisal report highlights that the subject property's "property rights" are being valued "fee simple," yet the "property rights" conveyed in each of the six comparable sales was a "leased fee" interest.

A leased fee interest values the "ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." The Appraisal of Real Estate, at 72. A property's leased fee value can be materially influenced by the leasehold interest, tenant quality, and the stream of rental income, and thus, is often not a reliable indicator of true or fair market value. The durability of the income stream, and thus the value of a property, is largely dictated by the quality of the tenant. A "leased fee . . . [valuation is] of dubious usefulness. The remaining term of a lease, the creditworthiness of the tenants, the influence of atypical lease clauses and stipulations, and other factors can affect the value . . . causing the sum to be less than or greater than the value of the fee simple estate." Id. at 505. Because a property's leased fee value is not always synonymous with its fee simple value, this court has consistently rejected conclusions of value premised upon the leased fee value. Marina Dist. Development Co., LLC v. City of Atlantic City, 27 N.J. Tax 469, 488 (Tax 2013), aff'd, 28 N.J. Tax 568 (App. Div. 2015), certif. denied, 223 N.J. 354 (2015); Pine Plaza Associates, L.L.C., 16 N.J. Tax at 199; Harclay House v. East Orange City, 18 N.J. Tax 564, 569 (Tax 2000); International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 423 (Tax 2004).

Here the court is charged with the responsibility of determining the market value of the subject property's stabilized fee simple interest. Stated differently, the price which a hypothetical

buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1st of the pretax year. See Petrizzo, 2 N.J. Tax at 200; Genola Ventures, 2 N.J. Tax at 551. Thus, value conclusions which may be premised on the creditworthiness of a tenant, the landlord's right to receive a specified contract rent, or atypical lease provisions do not offer meaningful insight into the market value of the subject property. This is not to say that a sales comparison approach that is adequately supported cannot be used to value an office building. "If the sale of a leased property is to be used as a comparable sale in the valuation of the fee simple estate of another property, the comparable sale can only be used if reasonable and supportable market adjustments for the differences in rights can be made." The Appraisal of Real Estate, at 406. Without a detailed understanding of the foregoing differences, including but not limited to the income and expenses of the comparable sales, there is no factual basis for concluding that such sales are in fact comparable and competitive with the subject property. Therefore, for the foregoing reasons, the court rejects New Providence's expert's sales comparison approach.

### d. Corrected assessment

Having reached a conclusion of the true or market value of the subject property, the court will determine the correct assessment for the 2010, 2011, 2012, and 2014 tax years. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of

assessed value exceeds the upper limit or falls below the lower limit, the formula for determining

the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value   x   Average ratio   =   Revised taxable value

For the 2010 tax year, the ratio of total assessed value, $10,378,993, to true market value,

$15,577,968, yields a ratio of .6663% which exceeds the upper limit (.5735%) of the Chapter 123

common level range.  Consequently, the assessment calculation for the 2010 tax year is:

$15,577,968   x      .4987  =      $7,768,700 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2010 will be entered as follows:

| | |
|---|---|
| Land | $1,133,300 |
| Improvement | $6,635,400 |
| Total | $7,768,700 |

For the 2011 tax year, the ratio of total assessed value, $10,378,993, to true market value,

$15,971,749, yields a ratio of .6498% which exceeds the upper limit (.5858%) of the Chapter 123

common level range.  Consequently, the assessment calculation for the 2011 tax year is:

$15,971,749   x      .5094  =      $8,136,000 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2011 will be entered as follows:

| | |
|---|---|
| Land | $1,133,300 |
| Improvement | $7,002,700 |
| Total | $8,136,000 |

For the 2012 tax year, the ratio of total assessed value, $10,378,993, to true market value,

$17,150,988, yields a ratio of .6052% which exceeds the upper limit (.5914%) of the Chapter 123

common level range.  Consequently, the assessment calculation for the 2012 tax year is:

$17,150,988   x      .5143  =      $8,820,800 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2012 will be entered as follows:

| | |
|---|---|
| Land | $1,133,300 |
| Improvement | $7,687,500 |
| Total | $8,820,800 |

For the 2014 tax year, the ratio of total assessed value, $10,378,993, to true market value, $17,320,241, yields a ratio of .5992% which exceeds the upper limit (.5962%) of the Chapter 123 common level range. Consequently, the assessment calculation for the 2014 tax year is:

$$\$17,320,241 \quad x \quad .5184 \quad = \quad \$8,978,800 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2014 will be entered as follows:

| | |
|---|---|
| Land | $1,133,300 |
| Improvement | $7,845,500 |
| Total | $8,978,800 |

Very truly yours,

Hon. Joshua D. Novin, J.T.C.

43